# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1011-16T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

A.D.,

    Defendant-Appellant,

and

THE BIOLOGICAL FATHER,
WHOMSOEVER HE MAY BE,

    Defendant.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF C.G.,

    Minor.

_____

        Submitted May 2, 2017 — Decided  June 9, 2017

        Before Judges Leone and Vernoia.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Bergen County,
        Docket No. FG-02-0033-16.

Joseph E. Krakora, Public Defender, attorney for appellant (Kourtney J.A. Knop, Designated Counsel, on the briefs).

Christopher S. Porrino, Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Nicholas Dolinsky, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Nancy P. Fratz, Assistant Deputy Public Defender, on the brief).

PER CURIAM

A.D. ("Mother") appeals the October 21, 2016 judgment terminating her parental rights over her son C.G. In her oral opinion, Jude Magali M. Francois found the New Jersey Division of Child Protection and Permanency ("Division") satisfied the best-interests test under N.J.S.A. 30:4C-15.1(a). We affirm.[1]

I.

The following facts come from the trial court's oral opinion, except as indicated. C.G. has two older half siblings who were removed from Mother's care in 2003 due to Mother's substance abuse. The children were placed with their fathers. They have not been in Mother's care since 2005.

---

[1] The court also terminated the parental rights of the unknown biological father of C.G., who remains unidentified despite the administration of numerous paternity tests.

C.G. was born in 2010.  The Division's evidence showed it received a referral at C.G.'s birth referencing Mother's history of substance abuse.  However, during 2010, Mother's urine tests were negative and she completed a substance abuse program at Comprehensive Behavioral Healthcare.

On November 13, 2014, the Division received a referral from the police stating Mother was intoxicated at a party and could not care for C.G.  Mother had glassy eyes, slurred speech, and an unsteady gait.  Mother admitted drinking several beers and tequila shots while taking her prescribed medications, Xanax and Oxycodone.[2]

The Division executed an emergency removal the following day, placing C.G. with his maternal aunt.[3]  The trial court granted the Division custody of C.G.  At Mother's suggestion, the Division placed C.G. with his maternal uncle ("Uncle") and his wife ("Aunt") in Pennsylvania in April 2015.  They continue to care for him and want to adopt him.

The Division referred Mother for substance abuse treatment at Comprehensive Behavioral Healthcare, but she was ineligible

---

[2] The Division's evidence indicated Mother again tested positive for alcohol in late December 2014.

[3] According to the Division's case manager, the aunt later decided she could not provide C.G. long-term care.

A-1011-16T3

because of her prescribed narcotic medications. Mother refused to attend another intensive outpatient substance abuse program. Mother submitted to a psychiatric evaluation and completed parenting classes, but she did not follow through with the recommendation to attend therapy, undergo ongoing urine screens, and enter a Mentally Ill, Chemically Addicted (MICA) program. Mother's psychiatric evaluation found she was addicted to Xanax and benzodiazepine and in need of a MICA program to address her substance abuse, depression, and anxiety.

In April 2015, Mother was admitted to a MICA program at CarePlus Addictive Services Program to address her substance abuse and mental health issues. However, she was discharged in August 2015 for inappropriate behavior, and failed to complete the program. In October 2015, Mother was taken to the hospital after planning to commit suicide by overdose, and was involuntarily committed. She then began inconsistently attending psychiatric and counseling services but was terminated for noncompliance. Mother was terminated from services at a mental health clinic in March 2016 and recommended for other programs, which she did not attend.

Mother was again admitted to the hospital in January 2016 for alcohol intoxication and a head injury. Over the next two months, Mother tested positive for alcohol, cocaine, benzodiazepines, and

A-1011-16T3

Oxycodone. In April 2016, Mother attended another psychiatric evaluation, in which it was recommended she attend a MICA program and detox from Xanax, neither of which Mother did.

After removal, Mother initially had regular visits with C.G., but visitation and phone contact were suspended by May 2015 when Mother repeatedly made inappropriate comments to C.G. The Division tried to arrange therapeutic supervised visitation (TSV) but Mother was not accepted into the TSV programs because of her prior noncompliance. All contact between Mother and C.G. ceased in May 2015.

After repeatedly refusing to attend evaluations, Mother failed to attend the August 2016 guardianship trial, and presented no evidence. The trial court found the Division presented clear and convincing evidence that it was in the best interest of C.G. for Mother's parental rights to be terminated. Mother appeals.

## II.

"Appellate review of a trial court's decision to terminate parental rights is limited[.]" In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002). Our task is to determine whether the decision "is supported by '"substantial and credible evidence" [i]n the record.'" N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (citation omitted). "We ordinarily defer to the factual findings of the trial court because it has the

opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (citation omitted).

"Particular deference is afforded to family court fact-finding because of the family courts' special jurisdiction and expertise in family matters." N.J. Div. of Child Prot. & Permanency v. N.C.M., 438 N.J. Super. 356, 367 (App. Div. 2014) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)), certif. denied, 222 N.J. 18 (2015). Thus, "[w]e will not overturn a family court's factfindings unless they are so '"wide of the mark"' that our intervention is necessary to correct an injustice." F.M., supra, 211 N.J. at 448 (citation omitted). We must hew to our deferential standard of review.

III.

"A parent's right to enjoy a relationship with his or her child is constitutionally protected." In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). However, this protection "is tempered by the State's parens patriae responsibility to protect the welfare of children." Id. at 347; see N.J.S.A. 30:4C-1(a).

Under Title Thirty, the Division must prove by clear and convincing evidence that termination of parental rights is in the

best interest of the child.  N.J.S.A. 30:4C-15(c); F.M., supra,
211 N.J. at 447.  The Division must show:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm.  Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

### A.

We first address whether the Division presented clear and convincing evidence to satisfy prongs one and two of the best-interests test.  The first two prongs "relate to the finding of harm arising out of the parental relationship."  In re Guardianship of DMH, 161 N.J. 365, 378 (1999).  They "are related to one another, and evidence that supports one informs and may support

the other as part of the comprehensive basis for determining the best interests of the child." Id. at 379.

Prong one "requires that the State demonstrate harm to the child by the parent" in the form of "endangerment of the child's health and development resulting from the parental relationship." K.H.O., supra, 161 N.J. at 348. The second prong requires the Division show "the harm is likely to continue because the parent is unable or unwilling to overcome or remove the harm." Ibid.

Harm can be proven "by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse . . . and the diversion of family resources in order to support a drug habit." Id. at 353. "[H]arm and risk of harm [can be] proven [where] the parents' drug use resulted in their failure to provide a stable home, with appropriate nurture and care of the young child[.]" N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 222 (App. Div. 2013).

The trial court found that Mother's "untreated substance abuse and mental health issues have caused harm to C.G. and continue to pose a risk to his health, safety, and development" and that she was "unwilling or unable to eliminate the harm" or "safely care for her son within the foreseeable future." There was ample evidence to support those findings.

Dr. Frank J. Dyer, a psychologist with expertise in child abuse and neglect, testified about Mother's history of alcoholism and history of drug abuse, specifically cocaine.[4] He found reunification with Mother "would place [C.G.] at risk for neglect because of [her] very erratic lifestyle punctuated by bouts of alcohol intoxication." Indeed, Mother tested positive for cocaine as recently as March 2016.

In addition, Mother was "suffering from mental disorders which adversely affect [her] ability to parent" and showed she lacked "the mental status sufficient to eliminate the risk of future harm to the child." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 440 (App. Div. 2001), certif. denied, 171 N.J. 44 (2002). Dr. Dyer noted Mother had a "history of psychiatric problems, primarily depression [and] episodes of extremely erratic disorganized behavior." He found Mother suffered from anxiety disorder, depressive disorder, and personality disorder with borderline antisocial and paranoid features. Her mental illness manifested in her interview, where she did not "deliver[] a . . . cohesive, rationale account of

---

[4] Dr. Dyer was unable to discuss Mother's history of alcoholism and cocaine abuse with her, as she walked out of her psychological evaluation.

A-1011-16T3

somebody who[se] life adjustment is within norm, but rather . . . a fragmentary, often contradictory, disorganized account."

Dr. Dyer concluded:

> The combination of [Mother]'s untreated alcohol and substance abuse problem, her tendency to have episodes of scattered and confused thinking processes, her emotional volatility, her paranoid stance toward others, and her continued antisocial acting out resulting in multiple arrests is a seemingly insurmountable obstacle to the subject's achieving adequate parenting capacity within the foreseeable future.

Dr. Dyer also testified to the "psychological[] abus[e]" Mother inflicted on C.G. Mother would "threaten[] to withdraw her love," "threaten[] suicide . . . in front of the child," and "tell[] [him] that if he did not behave that he should go and get another mommy." Dr. Dyer found this was "terribly destructive to the child's formation of a sense of self, specifically the child's self-esteem" and could impact "the child's capacity for developing intimate relationships in adolescence and adulthood." Dr. Dyer testified that if C.G. were placed in Mother's care, there would be "a risk of emotional abuse."

The Law Guardian called Dr. Elizabeth Smith, a psychologist with expertise in abuse and neglect cases, who testified there was "emotional abandonment" by Mother. Mother, during visits and phone contact, "would just say things that were incredibly

inappropriate and emotionally rejecting to him," including telling C.G. "I don't love you anymore when you do this." Mother also "would put him in a high chair and then turn the light out and walk out of the room." C.G. said Mother "choked him with a necklace." Dr. Smith noted C.G. "didn't even refer to [Mother] as his mother," instead calling her "the bad lady" or "the zombie mommy."[5]

Both experts found Mother's abusive and neglectful treatment caused C.G. to have behavioral problems and post-traumatic symptoms, including bed-wetting. Dr. Dyer found little if any likelihood Mother could eliminate her substance abuse, mental illness, and abusive behavior, or be able to parent C.G. without inflicting further harm. Moreover, Mother was noncompliant with all substance abuse and mental health programs. Dr. Dyer testified "her prognosis for being able to address these things successfully is extremely poor."

Further, as the trial court found, Mother lacked stable housing or employment. She claimed she had her own housing, but the evidence showed she had been kicked out of an apartment, was staying with the father of an elder son with whom she could not have contact, and her employer was unknown.

---

[5] Dr. Smith noted Mother repeatedly exposed C.G. to "frightening horror movies that were much too intense for a young child."

A-1011-16T3

Accordingly, there was sufficient evidence to support the trial court's findings on prongs one and two.

B.

To satisfy prong three, the Division must have "made reasonable efforts to provide services to help the parent correct the circumstance which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3).

The trial court correctly found the Division clearly and convincingly demonstrated it made reasonable efforts to assist Mother. The Division repeatedly referred Mother for substance abuse assessment and treatment. The Division set up psychiatric evaluations and psychological evaluations and referred Mother for counseling. Mother also had frequent visitation with C.G. until it was terminated, at which point the Division made reasonable efforts to institute therapeutic supervised visitation.

Mother argues the Division failed to tailor its services to her. Mother claims she should have been allowed to return to Comprehensive Behavioral Healthcare. The Division attempted to place Mother there, but she was rejected because she was taking prescribed narcotic medications. The Division is not to blame if Mother's drug use precluded her preferred program. Further, the Division provided other services that would aid Mother to overcome

12

her dependency on those medications, and be eligible for admittance at Comprehensive Behavioral Healthcare, but she failed to comply.

"'The diligence of [the Division]'s efforts on behalf of a parent is not measured by' whether those efforts were successful." F.M., supra, 211 N.J. at 452 (citation omitted). Rather, the Division's efforts are measured "against the standard of adequacy in light of all the circumstances of a given case." DMH, supra, 161 N.J. at 393.

Mother, having lost her visitation rights with C.G. because of her inappropriate comments, argues the Division failed to provide TSV. However, the Division made reasonable efforts. A referral was made to Children's Aid and Family Services, which would not accept her due to her history of noncompliance and denial of substance abuse. Further, the Division made a referral to CarePlus, which also would not accept Mother due to her previous termination from its program for bad behavior. Mother further argues the Division erred in not looking to a doctor frequently used by the Division. However, there was no evidence the doctor would have provided TSV services to Mother. In any event, the court credited both experts' testimony that restoring visitation would harm C.G.'s well-being.

In the same vein, Mother argues the Division did not adequately review relative placements for C.G. Mother argues the

13                                                      A-1011-16T3

Division improperly evaluated C.G.'s maternal grandmother and godfather. "The Division must perform a reasonable investigation of such relatives that is fair, but also sensitive to the passage of time and the child's critical need for finality and permanency." N.J. Div. of Youth & Family Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013), certif. denied, 217 N.J. 587 (2014).

The Division considered placement with C.G.'s maternal grandmother and godfather but determined it was not in C.G.'s best interest because C.G. had been placed for six months with Aunt and Uncle, who were "providing sufficient care and [were] fully committed to caring for him long term." "[N.J.S.A. 30:4C-12.1] and a related regulation, N.J.A.C. 10:120A-3.1, allow the Division to rule out a relative on such 'best-interests' grounds, regardless of the relative's willingness or ability to care for a child." Id. at 75. "This is especially true in light of this State's 'strong public policy in favor of permanency.'" Id. at 88, 89 (quoting K.H.O., supra, 161 N.J. at 357) (noting the "child has been in a positive foster home environment for a prolonged period" of ten months). The Division's decision was further justified by the maternal grandmother and godfather, who agreed C.G. should remain with Aunt and Uncle.

C.

To satisfy the fourth prong, the Division must prove by clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). Prong four "serves as a fail-safe against termination even where the remaining standards have been met." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 609 (2007).

Dr. Dyer completed a bonding evaluation with C.G. and his foster parents. Dr. Dyer concluded C.G. was profoundly attached to his foster parents, referring to them as "dad" and "mom." By contrast, C.G. was terrified of seeing Mother. Dr. Smith also performed an evaluation of C.G. She similarly testified C.G. "was very happy" with Aunt and Uncle, but when C.G. was "questioned about his mother," "he seem[ed] to regress and go back to bed wetting . . . and being worried."

No bonding evaluation was performed with C.G. and Mother. Dr. Smith opined "it would not be in [C.G.'s] best interest . . . to see his mother on a . . . one-time occasion even for a bonding evaluation." Dr. Smith testified if C.G. were to see Mother he would "become so overwhelmed by anxiety that he might have . . . some psychotic incident" that "might be very distressing for him and take time for him to recover." Dr. Dyer concurred that a bonding evaluation with Mother would be detrimental to C.G.

A-1011-16T3

Generally, to satisfy the fourth prong, the Division should present comparative bonding "'testimony of a well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship' with the natural parents and the foster parents." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 559, 564 (2014) (quoting In re Guardianship of J.C., 129 N.J. 1, 19 (1992)). Here, the trial court credited Dr. Smith's testimony that C.G. would be traumatized by a bonding evaluation with Mother. That was one of the "few scenarios in which comparative evaluations would not be required." N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 440 (App. Div. 2009).

Moreover, Dr. Dyer testified he had enough data to form an opinion about the relationship between C.G. and Mother without seeing them together. Dr. Dyer testified he had rarely seen a child who was more negative toward his birth mother. Mother expressed her own view of her relationship with C.G., telling Division workers "take him. Let them adopt him. I don't want him." Mother cannot fault Dr. Dyer's information as incomplete when she prevented further inquiry by storming out of his evaluation.

The trial court credited Dr. Dyer's testimony that placing C.G. in Mother's custody would cause him catastrophic

psychological harm, remove the center of his emotional world, and cause him to suffer enormous regression. The court found C.G. was flourishing with Aunt and Uncle, who were providing him with a stable and happy home, were facilitating contact between C.G. and his half siblings, and who were committed to adopting C.G. The court found that permanency should not be further delayed and that C.G. must not be held hostage by Mother's inaction. See N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div.), certif. denied, 180 N.J. 456 (2004). The evidence amply supported those findings and the court's conclusion that it would not do more harm than good to terminate Mother's parental rights.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1011-16T3