**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3666-13T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

       Plaintiff-Respondent,

v.

N.C.M.,

       Defendant-Appellant,

and

T.E. and J.C.,

       Defendants.
_____

IN THE MATTER OF THE GUARDIANSHIP
OF T.M., M.L.W., and M.A.J.M., minors.
_____

| APPROVED FOR PUBLICATION |
| :---: |
| **December 16, 2014** |
| **APPELLATE DIVISION** |

        Argued telephonically November 19, 2014 —
        Decided December 16, 2014

        Before Judges Sabatino, Simonelli, and
        Guadagno.

        On appeal from the Superior Court of New
        Jersey, Chancery Division, Family Part,
        Hudson County, Docket No. FG-09-210-14.

        Eric R. Foley, Designated Counsel, argued
        the cause for appellant (Joseph E. Krakora,
        Public Defender, attorney; Mr. Foley, on the
        brief).

Renee Greenberg, Deputy Attorney General, argued the cause for respondent (John J. Hoffman, Acting Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Greenberg, on the brief).

Catherine Davila, Designated Counsel, argued the cause for minors T.M., M.L.W., and M.A.J.M. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Ms. Davila, on the brief).

The opinion of the court was delivered by

GUADAGNO, J.A.D.

Defendant N.C.M. (Nora)[1] appeals from the April 1, 2014 judgment of guardianship which terminated her parental rights to her daughters T.M. (Tara) and M.L.W. (Mary), and her son, M.A.J.M. (Matt). At the time of the guardianship trial, Tara, Mary, and Matt were nine, seven, and thirteen months, respectively.

Defendant contends that the Division of Child Protection and Permanency (Division) did not prove by clear and convincing evidence the third and fourth prongs of the best interests test required for termination. N.J.S.A. 30:4C-15.1(a). Specifically, she claims that the Division's failure to provide reasonable efforts to prevent placement and effectuate reunification with her children is a direct result of an earlier

---

[1] We employ pseudonyms to protect the privacy of the minors and for ease of reference.

failure by the Division to provide adequate services to her when she was a minor and under the Division's care and supervision.

We are satisfied that the Division proved the requisite statutory factors required to terminate defendant's parental rights by clear and convincing evidence. The circumstances of this case, however, compel us to discuss the Division's obligation to provide services, specifically mental health evaluations and treatment to minors under its care, and whether the failure to provide such services can be considered in evaluating reasonable efforts if the minor later becomes a defendant in a guardianship proceeding.

I.

Nora was born in 1989. Although the record is sparse from this period, it appears that shortly after her birth, the Division took custody of Nora and placed her with B.J.M. (Beth) and her husband, who later adopted her. Nora's birth parents died during her early childhood and her adoptive father died in 2001. Nora grew up with five siblings, all of whom were adopted by Beth.

After experiencing problems completing the fourth grade, Nora was placed in special education classes and was diagnosed with a reading disorder. It appears that, at some point, Nora

was classified as disabled, and Beth received benefits on her behalf.[2]

The Division was again involved with Nora in February 2002, when it received a referral that Nora, who was then twelve, had been beaten. After determining that Nora was uninjured, the Division found the allegation to be unsubstantiated. In June 2003, the Division received another referral alleging that Nora had been injured internally. This time, the Division confirmed that Nora had been injured, and Beth was responsible. The record does not indicate what, if anything, the Division did in response, although Nora continued to reside with Beth.

Later that year or in early 2004,[3] the Division removed Nora and her siblings from Beth's custody due to Beth's alcoholism. Details on Nora's initial placement are not included in the record, but in November 2004, when she was fifteen and still under the Division's care, Nora gave birth to Tara. The Division placed Nora and Tara in a high school program for teen mothers, but Nora withdrew from the program in 2005.

---

[2] This conclusion is drawn from Nora's statement to an evaluating psychologist that Beth took her social security check and used it to pay Beth's mortgage.

[3] The record only indicates that Nora was removed at age fourteen.

A-3666-13T3

In December 2006, Nora gave birth to Mary. Shortly after Mary's birth, Beth made a referral to the Division alleging that Nora had moved back into her home without permission. Due to Beth's substance abuse issues, the Division removed Tara but permitted Nora, who was then seventeen, to continue living with Beth.

In May 2007, Beth made another referral to the Division after an altercation with Nora. Beth told the caseworker that she wanted Nora out of her house. A Division report indicates that Tara had been returned to Nora and witnessed the incident but does not indicate whether the Division took any action.

In December 2010, Beth made another referral to the Division alleging that Nora "leaves the children with anyone that is available." Nora had been living at her sister's home with Tara and Mary, but was thrown out and moved back in with Beth. Beth also alleged that Nora would not get out of bed to take care of the children, which she attributed to drug and alcohol abuse.

The Division investigated the same day. Nora told the caseworker that she had nowhere to live if she could not stay with Beth. The caseworker presented Nora with the option of going to a shelter or paying for a hotel. If she did not find

housing, the caseworker told Nora that the Division would remove her children.

Although Nora moved in with a relative, the Division substantiated her for neglect due to "inadequate shelter" because "her shelter problem is chronic as she has a pattern of homelessness for the past six years . . . [and] has been in shelters, stayed with family members and in friends' homes."

After the December 2010 incident, the Division referred Nora for homemaker services and psychological and substance abuse evaluations. Although she attended the homemaker services, Nora refused to submit to a drug screen and did not appear for her psychological evaluation. In March 2011, Nora became homeless for the third time in two months.

The current litigation resulted from a referral received by the Division in April 2012 alleging that Nora was under the influence when she picked up her daughters from school. Nora was so impaired that she could not write her daughters' names to sign them out of school. Division caseworkers learned that Nora had been escorted out of the building by police and the girls' maternal aunt had picked them up. Two days earlier, Nora had picked up one of her daughters from school and later returned to the school claiming the child was missing. The child was found wandering alone near a local daycare center. The Division also

learned that Tara had missed thirty-nine days of school and would be held back in the first grade.

Nora admitted to smoking a mixture of marijuana and PCP known as "dip" earlier in the day. The caseworker observed that Nora remained under the influence during the interview, as she continually opened and closed her eyes, swayed in place, and alternatively laughed, yelled, or said nothing in response to the worker's questions. Nora also admitted that she had been staying in various homes. Tara and Mary confirmed that they had been staying in Jersey City, but did not know where.

As a result of the investigation, the Division executed an emergency Dodd removal[4] of Tara and Mary. The children were placed with a resource parent and family friend of Nora's, N.M. (Natalie), where they remain to date. T.E. (Tom), the biological father of Tara and Mary, was incarcerated at the time of removal.

The Division offered services following the removal, including weekly supervised visitation, substance abuse and psychological evaluations, substance abuse treatment, parenting

---

[4] A Dodd removal is an emergency removal of a child from the home without a court order or the consent of the parent or guardian. It is authorized "if the child is in such condition that the child's continuance in the place or residence or in the care and custody of the parent or guardian presents an imminent danger to the child's life, safety, or health, and there is insufficient time to apply for a court order." N.J.S.A. 9:6-8.29.

skills classes, and two letters to welfare regarding housing assistance.  The Division also assessed three relatives as potential placement options, but all were ruled out.

Nora failed to appear for her first scheduled psychological evaluation, but attended the rescheduled visit with Dr. Robert Kanen.  Dr. Kanen diagnosed Nora with marijuana and PCP abuse, based on the April 2012 incident and her admission that she used those drugs on a daily basis for six months in 2011.  He found that Nora has an IQ of sixty-seven, is functionally illiterate, and is "cognitively and learning disabled."  Dr. Kanen recommended substance abuse treatment and parenting skills classes, but stated that her capacity to benefit from either is limited due to her cognitive impairments.  Nora was referred for parenting skills classes but was discharged from the program for non-compliance.

Nora began substance abuse treatment at Health Path in October 2012, but was discharged from the program after one month for non-compliance.  The Division referred Nora for a new drug abuse evaluation, after which she began treatment at New Pathways in December 2012.  She successfully completed this intensive outpatient program two months later.

Nora also participated in daily counseling and group therapy from June 2012 through February 2013.  She attended

their Women's Group, Narcotics Anonymous Group, and Anger Management Group for those nine months.

In February 2013, the Division received a referral from Jersey City Medical Center regarding the birth of Nora's third child, Matt.[5] The referent alleged that Nora had not received any prenatal care and suggested that Nora was suffering from cognitive or psychological impairments that would limit her ability to care for the child.

A Division caseworker investigated and Nora admitted that she did not receive prenatal care but explained that she did not have health insurance. A nurse observed that Matt appeared healthy and that Nora acted appropriately with him. Drug screens of Nora and Matt were negative.

Nora claimed to be staying with a friend named James, but could not provide his last name or address. Nora offered to stay with a family friend if James' home was deemed inappropriate. Although the family friend had adopted four Division children already, her resource parent license had expired and, as a result, the Division ruled her out as a placement. The Division took custody of Matt upon his discharge

---

[5] Nora listed J.C. as Matt's putative birth father, but he could not be located.

A-3666-13T3

from the hospital and initially placed him in a separate foster home, but later placed him in the same home as Tara and Mary.

Nora submitted to a psychological evaluation with Dr. Jemour Maddux, who concluded that Nora's reunification with her children could occur within six months if Nora remained drug-free. He recommended unsupervised visitation leading to overnight visits, concurrent supervised visitation, therapy with the children, adult literacy classes, and a support group upon reunification.

In April 2013, the court approved the Division's permanency plan of reunification and found the six-month time frame appropriate. Nora never received unsupervised visitation as the Division had concerns that she was still using drugs. Nora tested positive for PCP later that month and again in May 2013. A supervised visit that month was terminated because she was visibly under the influence. Nora was referred to the inpatient program at Straight and Narrow.

As a result of her relapse, the court changed the permanency goal to termination of parental rights and the Division filed a complaint seeking guardianship of all three children.

During evaluations with Dr. Maddux, Tara and Mary disclosed exposure to Nora while she was "under the influence." Dr.

10                                                          A-3666-13T3

Maddux concluded that this indicated neglect. Both girls also stated that their mother no longer abuses drugs and were optimistic about reunification. Reports of Nora's visitation with the girls were positive, with the children displaying a close bond, loving interactions, and Nora demonstrating good parenting skills.

Nora was discharged from Straight and Narrow in October 2013 for non-compliance and fraternizing with a male patient. She tested positive for PCP at a subsequent evaluation. While she was consequently referred to an inpatient program at Turning Point, Nora did not attend. Her urine screen was positive for PCP again later in October 2013.

Nora was again referred for parenting classes, but was terminated after one month for non-compliance. She was re-referred for substance abuse treatment at Integrity House, but was non-compliant, and her case was closed in December 2013. She was re-referred for parenting classes in March 2014, but was discharged for failure to attend.

On January 27, 2014, Tom executed an identified surrender of his parental rights of Tara and Mary to Natalie. Nora's guardianship trial began in March 2014. The court first heard from caseworker Raymond Brown, who testified to the services offered to Nora to effectuate reunification, including parenting

A-3666-13T3

classes, substance abuse assessments, substance abuse treatment, supervised visitation, psychological evaluations, relative assessments, transportation assistance, and referrals for housing assistance. He stated that Nora was transient, had failed to complete parenting classes or inpatient substance abuse treatment, and could not provide proof of employment. He indicated that Tara and Mary had expressed their desire to be adopted by Natalie.

Dr. Kanen testified that Nora's severe parenting deficits made it very difficult for her to provide her children with a stable home. He noted Nora's history of drug abuse, and that she did not believe she needed drug treatment. Dr. Kanen also noted that Nora remained dependent on living with others due to her continued homelessness, and that she was aware of the services that the Division wanted her to complete but believed they were unnecessary. Dr. Kanen concluded that based on Nora's cognitive impairments, unstable housing, and continued use of PCP, she was incapable of providing the three children with a permanent, safe, and secure home. He also testified that her ability to parent is unlikely to change in the foreseeable future because her psychological issues are chronic and she has not addressed her drug problem.

Dr. Kanen testified that the bonding evaluation revealed that the girls displayed "avoidant attachment" as shown by their withdrawal after witnessing Nora's oppositional behavior toward a Division caseworker. He concluded that Nora and Matt have no attachment, and that the girls' attachment to her "at best is very, very insecure."

By contrast, Dr. Kanen testified that the girls engaged in conversation with Natalie and appeared excited and happy. He concluded that they are securely attached to Natalie and, although Tara and Mary would likely experience some grief if Nora's parental rights were terminated, they would not suffer serious and enduring harm and Natalie could ameliorate what grief arose. Due to a lack of any attachment, Dr. Kanen noted that Matt would suffer no harm upon termination. He testified that all three children would be at risk for serious and enduring harm if returned to Nora's care.

Neither the law guardian, who supported the Division's request for termination, nor Nora presented any witnesses. The court found that the Division had met its burden of proving all four prongs of N.J.S.A. 30:4C-15.1 by clear and convincing evidence, and entered a judgment of guardianship terminating Nora's rights to Tara, Mary, and Matt.

A-3666-13T3

On appeal, Nora presents the following bifurcated argument:

POINT I

THE DIVISION FAILED TO MEET ITS BURDEN OF PROOF WHERE THERE WAS NOT CLEAR AND CONVINCING PROOF SUFFICIENT TO SATISFY THE FOUR PRONGS OF <u>N.J.S.A.</u> 30:4C-15.1(A).

A. THE DIVISION FAILED TO PROVIDE REASONABLE EFFORTS TO PREVENT PLACEMENT AND TO EFFECTUATE REUNIFICATION BECAUSE THE UNDERLYING PREDICATE CIRCUMSTANCES OF THIS CASE THAT LEAD TO ANY ALLEGED HARMS TO THE CHILDREN WERE A DIRECT RESULT OF THE DIVISION'S FAILURE TO PROTECT N.M. AND HER CHILDREN DURING N.M.'S MINORITY.

B. THE DIVISION FAILED TO PROVIDE REASONABLE EFFORTS TOWARDS REUNIFICATION AFTER THE CHILDREN WERE REMOVED.

C. THE DIVISION FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT TERMINATION OF PARENTAL RIGHTS WILL NOT DO MORE HARM THAN GOOD DUE TO THE DIVISION'S INTERFERENCE IN THE COMPARATIVE BONDING EVALUATIONS.

II.

Our review of a trial court's judgment terminating parental rights is limited. <u>N.J. Div. of Youth & Family Servs. v. M.M.</u>, 189 <u>N.J.</u> 261, 278 (2007). The trial court's factual findings are binding on appeal if supported by adequate, substantial, and credible evidence. <u>Cesare v. Cesare</u>, 154 <u>N.J.</u> 394, 412 (1998) (citing <u>Rova Farms Resort, Inc. v. Investors Ins. Co.</u>, 65 <u>N.J.</u>

14                                        A-3666-13T3

474, 484 (1974)).  Particular deference is afforded to family court fact-finding because of the family courts' special jurisdiction and expertise in family matters.  Id. at 413.  A trial court's legal conclusions, however, are not entitled to deference.  N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 183 (2010).

A parent's right to raise and maintain a relationship with his or her child is constitutionally protected.  In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999).  That right is not absolute, however, and must be balanced against the State's parens patriae responsibility to protect the welfare of its children.  N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009).  Courts apply the "best interests of the child" standard to properly balance parental rights against the State's interest.  K.H.O., supra, 161 N.J. at 347.  That standard permits termination of parental rights only where the State proves the following elements by clear and convincing evidence:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from

A-3666-13T3

his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

These four factors are neither discrete nor separate, but instead overlap to provide a comprehensive standard that identifies a child's best interests. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 606-07 (2007). The analysis is "extremely fact sensitive and require[s] particularized evidence" for the given case. Id. at 606. For involuntary termination, the "cornerstone of the inquiry [is] whether the parent can cease causing his or her child harm and become fit to assume the parental role within time to meet the child's needs." N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 479 (App. Div. 2012) (citation omitted).

Nora does not contest that the Division proved prongs one and two by clear and convincing evidence. Therefore, we address only her challenge to the proofs as to prongs three and four.

16                                                              A-3666-13T3

A.

Under the third prong of the best-interests standard, the Division must make "reasonable efforts to provide services to help the parent correct the circumstances" that necessitated removal and placement of the child in foster care. N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts" may include parental consultation, plans for reunification, services essential to achieving reunification, notice to the family of the child's progress, and visitation facilitation. N.J.S.A. 30:4C-15.1(c). More specific services include day care, housing assistance, referrals to drug treatment, medical or health care, parenting classes, financial assistance, and the like. In re Guardianship of D.M.H., 161 N.J. 365, 391 (1999).

The reasonableness of the Division's efforts "is not measured by their success." L.J.D., supra, 428 N.J. Super. at 488. Even if the Division's efforts are deficient, the best interests of the child standard still controls whether termination is appropriate. Ibid. Defendant's challenge to the prong-three proofs is based on her claim that the Division failed to protect her and her children during her minority when she was under the Division's care. She alleges that these failures caused any alleged harm suffered by the children during the pendency of this litigation. Defendant does not contest

that the Division provided multiple psychological evaluations, with follow-up treatment. Simply stated, Nora's argument is that the Division's failure "to protect [her] and provide reasonable services when she was a child-parent caused the almost inevitable issues that arose in [her] early adulthood years."

We acknowledge that the Division's apparent failure to provide services to Nora after her removal from Beth's home when she was fourteen gilds this argument with superficial appeal. However, we are aware of no statutory authority or precedent holding that the Division's failure to provide services to a child under its care can be considered in a subsequent guardianship matter involving that same child in her later capacity as a parent when assessing the adequacy of services required under Title 30.

We also view defendant's argument that her problems would have been lessened or even abated had she received adequate care during her minority as speculative. The fact remains, and Nora does not dispute, that during the pendency of this litigation the Division provided ample services to her and she failed to take full advantage of them. While Nora's argument that the Division's services were offered too late to functionally assist her in becoming a suitable parent finds ample support in the

record, we are compelled to reject it as untethered to statutory or other existing legal authority.

The Division removed Nora from Beth's custody when she was fourteen, and remained involved with her and her siblings over the next three years. The record is devoid of any evidence of services provided to Nora during this time when she gave birth to two children. Nor is there any explanation why the Division removed Tara from Beth's home because of her alcoholism but allowed Nora, also a minor under the Division's care, to remain.

Even a cursory examination of Nora's history would have alerted the Division to her struggles in school and apparent learning disability. Had the Division provided a psychological evaluation when Nora was first removed, there would have been insight into her low IQ, and help could have been provided.

N.J.A.C. 10:122D-2.5(a) requires such evaluations and follow-up services:

> The Division representative shall make every reasonable effort to assure that each child in out-of-home placement receives appropriate and necessary health care, including mental/behavioral health services.

This obligation is reaffirmed in subsection (f):

> The Division representative shall assure that the child receives a medical examination at least annually after the initial medical examination performed at the time of placement . . . . The Division representative shall assure that each child

> with a suspected mental/behavioral health
> need receives a mental/behavioral health
> assessment and identified follow-up care.
> At a minimum, the child's examinations shall
> comply with the Early and Periodic Screening
> and Diagnostic Treatment periodicity
> schedule in accordance with N.J.A.C. 10:54-
> 5.10 through 5.13.

After the Division removed Nora from Beth's custody, the only record of Division interaction with Nora thereafter came as the result of Beth's numerous referrals. The only "substantiated" allegation against Nora during this period is that she was homeless from ages fourteen to nineteen, a highly questionable finding. Other than the placement in a high school for teen mothers in 2004, the record is devoid of Division efforts to assist Nora with any of her problems during these formative years.

In 2012, Dr. Kanen determined Nora's IQ was sixty-seven, she was functionally illiterate, and cognitively and learning disabled. While it is regrettable that the Division did not identify and address these deficiencies earlier, we decline to recognize a causal link between those failures and the adequacy of the services that were ultimately offered to Nora as a defendant parent in this proceeding.

### B.

Nora challenges the Division's proofs under the fourth prong and argues that a Division caseworker's interjection into

her bonding evaluation "caused a skewed result that was then relied upon by the court" in determining that termination would not do more harm than good.  We disagree.

To satisfy the fourth prong of the best-interests test for termination, the Division must prove by clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good."  N.J.S.A. 30:4C-15.1(a)(4).  "The question to be addressed . . . is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents."  K.H.O., supra, 161 N.J. at 355.

The child's "paramount need" for permanent, stable, and defined parent-child relationships is key.  Ibid.  It is therefore against a child's best interests to prolong permanent placement because the natural parent is unable to care for the child for a protracted period.  N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 592 (App. Div. 1996).

A court must inquire into the child's relationship with both the natural and foster parents on prong four.  K.H.O., supra, 161 N.J. at 355.  To that end, the Division should offer the testimony of a "well qualified expert who has had full opportunity to make a comprehensive, objective, and informed

evaluation of the child's relationship with the foster parents." In re Guardianship of J.C., 129 N.J. 1, 19 (1992). "[W]here it is shown that the bond with foster parents is strong and, in comparison, the bond with the natural parent is not as strong, that evidence will satisfy the requirement of N.J.S.A. 30:4C-15.1(a)(4) that termination of parental rights will not do more harm than good to the child." K.H.O., supra, 161 N.J. at 363.

Here, the trial court relied on Dr. Kanen's conclusions from the bonding evaluations he conducted with the foster parent in January 2014 and with Nora in February 2014. Dr. Kanen testified that the children are securely attached to Natalie but have only an insecure attachment to Nora and would not suffer serious or enduring harm if permanently separated from Nora, but would suffer such harm if returned to her care. He further opined that Natalie is able to ameliorate any emotional harm resulting from the termination of Nora's parental rights. The court noted that Nora failed to present any evidence to the contrary and found that the Division had satisfied this prong.

Nora asserts that the court's comparative bonding analysis is flawed because a Division caseworker interfered with her evaluation. Dr. Kanen testified that he permitted caseworker Kim Johnson to enter the room in which the bonding evaluation was to take place immediately behind himself and the family.

The evaluation began in the hallway two to three minutes previously. Johnson and Nora argued for a few minutes, at which point Johnson left to get her supervisor. The supervisor and Johnson returned and continued to argue with Nora for several minutes more, while Tara and Mary became continually more withdrawn. Dr. Kanen did not stop or move the conversation elsewhere to avoid exposing the children to the conflict. He testified that he allowed the argument to continue because he did not anticipate the discussion would escalate, he had never conducted an evaluation that had been interrupted by the Division, and did not know whether to acquiesce or object.

Dr. Kanen noted that the girls were initially happy at the evaluation, but became withdrawn and depressed upon witnessing Nora's oppositional behavior toward the Division workers. In his report, Dr. Kanen wrote that this incident was "an example of how [Nora's] oppositional behavior can have a detrimental impact on the emotional development of these two girls. [Nora] had no insight into the reaction of [Tara] and [Mary]. She showed no evidence of sensitivity to how her behavior and emotions affect her children."

Although it would have been preferable that any discussions between the caseworker and defendant had not interfered with the evaluations, we do not find the procedure so flawed that it

should have been disregarded by the trial court. Ultimately, Dr. Kanen's testimony remains unrebutted and the trial court credited his testimony in concluding that the children would not suffer more harm than good from terminating Nora's parental rights. The record contains substantial, credible evidence to support this conclusion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3666-13T3