# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4693-17T4

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

M.T.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF G.T.,

      a Minor.

_____

      Submitted August 28, 2019 – Decided October 1, 2019

      Before Judges Alvarez and Gooden Brown.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FG-19-0032-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Kathleen Gallagher, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Mohamed Barry, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Rachel E. Seidman, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant M.T.[1] appeals from the April 27, 2018 judgment of guardianship that terminated her parental rights to her son, G.T., born March 2016.[2] Defendant contends plaintiff, New Jersey Division of Child Protection and Permanency (Division), failed to prove prongs one, three, and four of the best interests standard embodied in N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. The Law Guardian supported termination before the trial court and, on appeal, joins the Division in urging us to reject defendant's

---

[1] Pursuant to Rule 1:38-3(d)(12), we use initials to protect the confidentiality of the participants in these proceedings.

[2] Defendant has an older son who was in the custody of his father in Delaware and not involved in these proceedings.

A-4693-17T4

arguments in their entirety and affirm. Having considered the arguments in light of the record and applicable legal standards, we affirm.

N.J.S.A. 30:4C-15.1(a)(1) to -15.1(a)(4) requires the Division to petition for termination of parental rights on the grounds of the "best interests of the child" if the following standards are met:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

The four criteria "are not discrete and separate," but rather "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 167

A-4693-17T4

(2010) (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 606-07 (2007)).

On April 24, 2017, the Division filed a verified complaint to terminate defendant's parental rights and award the Division guardianship of G.T.[3] We will not recite in detail the circumstances that led to the filing of the guardianship complaint, which began with the emergency removal of G.T. on March 11, 2016, when defendant attempted to surrender G.T. at the Newton Police Department because she feared for his safety. At the time, defendant had relocated to New Jersey from Delaware because she believed that gang members, from whom she had stolen "[four] kilos of dope" four years earlier, were after her and forcing her to give up her baby. After Division caseworkers responded to Newton Police headquarters and learned that defendant was receiving mental health treatment at the Newton Medical Center,[4] G.T. was

---

[3] At the time of the guardianship trial, despite defendant providing the names of two potential biological fathers, DNA results ruled them out. Thus, G.T.'s biological father remained a John Doe.

[4] According to a psychiatric evaluation conducted a few days prior to G.T.'s birth and a forensic assessment conducted shortly after G.T.'s removal, defendant suffered from mental illness, including Delusional Disorder, Bipolar 1 Disorder, and Schizoaffective Disorder.

A-4693-17T4

placed with his current resource parents, where he has remained throughout the litigation. The Division was later granted custody, care, and supervision of G.T.[5]

The guardianship trial was conducted over two days, beginning on April 16, 2018. At the trial, in addition to the admission of numerous documentary exhibits, Division caseworker Meghan Devilliers, the custodian of the Division's records, testified about the Division's involvement with defendant, detailing her history of hospitalizations at various psychiatric facilities and her intermittent periods of incarceration, as well as defendant's admissions regarding engaging in prostitution, unstable housing, and transient lifestyle. Devilliers also delineated the Division's efforts to assess placement options and provide services to help defendant correct the circumstances that led to G.T.'s removal. Division expert Frank J. Dyer, Ph.D., a psychologist, testified about the bonding evaluation he conducted on August 10, 2017, between G.T. and the resource parents. G.T.'s resource parent, J.N., also testified and confirmed that she and her husband were committed to adopting G.T., who got along with the entire

---

[5] Although there was no finding of abuse or neglect under N.J.S.A. 9:6-8.21(c), the court maintained jurisdiction under N.J.S.A. 30:4C-12, and continued the Division's custody of G.T., as the family was a family in need of services.

family, including her two minor children. Defendant did not attend the trial but was represented by counsel, who waived her appearance. Neither the Law Guardian nor defendant presented any witnesses.

We incorporate by reference the factual findings and legal conclusions in Judge Michael C. Gaus' comprehensive oral opinion delivered from the bench on April 27, 2018. We only recite the judge's key findings supporting his decision. Preliminarily, the judge found all three witnesses credible. The judge described Dr. Dyer's testimony as "clearly consistent with his wealth of knowledge, particularly in the field" of "attachment and bonding." According to the judge, Dr. Dyer was "prepared and persuasive" and testified "honestly[,] . . . credibly and forthrightly." Similarly, the judge found Devilliers and J.N. "to be . . . credible and believable witness[es]."

First, the judge reviewed the circumstances of the Division's initial involvement with defendant as well as the two years that G.T. had been in placement. The judge noted that at the time of G.T.'s removal, defendant was "paranoid, possibly delusional, and appeared to be experiencing a psychotic break." The judge continued, making the following factual findings:

> [Defendant] was at the time residing at Birth Haven, a facility set up with a specific purpose of providing assistance to pregnant mothers and new mothers. At that time[,] Ms. Devilliers testified that [defendant] was

attending mental health services being provided through Newton Medical Center, which she had arranged on her own and the Division then connected her to services to be provided through a contract service provider known as New Bridge.

The Division arranged for one hour a week of supervised visitation commencing immediately and . . . that visitation continued until June 2016 when [defendant] voluntarily left the State of New Jersey for the State of Delaware. Thereafter, Ms. Devilliers testified that [defendant] was initially hospitalized in Delaware and was then incarcerated due to an outstanding warrant. She remained incarcerated until March 2017. During that time[,] the Division had monthly phone contact and one in-person visit with [defendant]. Once [defendant] was incarcerated in . . . Delaware, the Division did not continue visitations, which was subsequently approved by another judge in November 2016. Ms. Devilliers testified that the reason for no visitation included the extreme infancy of the child, the distance and travel time for a child of that age, and the lack of any then existing bond between the child and the mother because the child had been removed from the mother when he was only six days old.

[Defendant] did initiate contact with the Division in March 2017 when she was released from jail in Delaware. She indicated to the Division that she wanted to reestablish visitation with the child. The Division indicated that it would support visits in New Jersey, but [defendant] was unable to come to New Jersey because it was reported that Delaware would not sign off on her leaving the State while she remained on probation. However, despite these limitations, Ms. Devilliers testified that [defendant] then left . . . Delaware and moved to Florida and she thereafter

7

remained in . . . Florida from approximately June 2017 through December 2017. . . . [Defendant] maintained some limited contact with the Division during that time, advising that she was essentially transient and primarily staying in hotels and perhaps some shelters. Otherwise[,] she was occasionally staying with people who[m] she somehow knew or met.

. . . .

There was a phone conversation between Division Worker Bennet and [defendant] on July 6, 2017. [Defendant] advised that she would not come back to New Jersey for a scheduled psychological evaluation on August 8, 2017, nor would she attend a scheduled court proceeding on August 11, 2017. When the worker asked her about her plans, [defendant] stated that she wanted to try to get her oldest son back, but regarding [G.T.,] she was, . . . "not in a place to care for him" . . . . [Defendant] advised that she did not have her own housing, but was staying with a friend. The Division worker offered to try to assist her in finding housing or a shelter, but [defendant] said she wouldn't qualify to get into a shelter. Also, there had been another arrest in Florida [but defendant] was unable to share the details or advise of her next Florida court date. [Defendant] further acknowledged that there was an arrest warrant for her issued by the State of Delaware.

. . . .

[Defendant] advised the Division that in December 2017[,] she voluntarily returned to . . . Delaware and voluntarily surrendered to Probation because of her violation of probation for leaving the [S]tate. [Defendant] then reported to the Division that the warrants were vacated and she was remaining in . . . Delaware. Ms. Devilliers testified that from December

8

2017 until February 2018[,] [defendant] represented that she was remaining in a domestic violence shelter in . . . Delaware that also provided her with wrap-around mental health services. Ms. Devilliers was able to independently confirm with the shelter that [defendant] was staying at a shelter in Dover, Delaware.

In February 2018[,] the Division received information that [defendant] had again been incarcerated and since that time her whereabouts remain unknown. The Division was not able to have contact with her since then.[6]

Recounting the services the Division offered defendant, the judge stated that before defendant left New Jersey for Delaware in June 2016, the Division "offered visitation," referred defendant for "a psychological evaluation and anger management[,]" and completed collateral contacts with all of her service providers. However, defendant refused most of the services, with the exception of visitations. Further, although defendant completed the initial psychological evaluation, "[t]here was no indication that she ever followed up with any of the . . . recommendations." Even after defendant's relocation to Delaware, the

---

[6] At trial, the Division explained that it continuously made efforts to locate defendant since February 2018, including "reach[ing] out to her adoptive parents" who "indicated that they had . . . heard she was somewhere in Delaware" but did not know "her exact whereabouts." In addition, Devilliers sent defendant "several emails," one as recent as the night before the first day of trial, but defendant never responded.

Division continued its attempt to provide services in the form of "referrals for evaluations, communication with the jail . . . to try to link her to services[,] . . . [and] communication with her . . . family [and] relatives." The judge explained that although defendant had told Devilliers "that her plan was to reunify with [G.T.]," she "offered no specifics[,]" and "never offered a parenting plan[.]"

The judge also elaborated on the Division's efforts to explore placement options. According to the judge, at defendant's request, four individuals were explored, specifically, C.T., defendant's adoptive mother, F.D., Sr., the birth father of defendant's older child, and C.H. and A.C., two family friends. However, all four individuals "were ruled out."[7] Reportedly, C.H. was "actively engaged in prostitution," and A.C. did not cooperate with the Division. F.D., Sr. and C.T. both resided in Delaware but "did not cooperate with initial contacts and requests for the submission of information" to conduct ICPC[8] investigations. Further, F.D., Sr. "advised the Division that he was not in a place to care for a

---

[7] At trial, the Division was only able to produce two rule-out letters, one for C.H., dated June 23, 2016, and the other for A.C., dated July 20, 2016. It is unclear whether the Division failed to send rule-out letters to the other two individuals or simply failed to produce them at trial.

[8] ICPC or the Interstate Compact on the Placement of Children, N.J.S.A. 9:23-5, establishes procedures for ensuring the safety and stability of placements of children across state lines.

 A-4693-17T4

newborn child." As to C.T., with whom defendant had a complicated and volatile relationship, "[C.T.'s] home would be inappropriate because of the high level of conflict between [defendant] and her adoptive mother, including [defendant] having threatened to burn down her mother's home and having thereafter returned to the residence and then being arrested." Additionally, the judge pointed out that "while [defendant] did provide the name of some siblings, there was no contact information provided," and when "the Division attempted to obtain that information from [C.T.], . . . she never responded to the Division's request."

The judge also considered Dr. Dyer's testimony regarding the bonding evaluation he conducted between G.T. and the resource parents. During the bonding evaluation, Dr. Dyer looked for "a quality relationship, including affection, positive contact[,] and proper praise." In this case, Dr. Dyer found "[G.T.] to be happy, enthusiastic, and secure with the resource parents." Moreover, Dr. Dyer concluded from G.T.'s "developmental testing results" that G.T. "was developing and advancing normally[.]" Specifically, he was "within the average range for his age regarding language, social maturity, motor skills, and self-help skills[,]" all of which were important as they "reflect[ed] signs of a healthy child/parent bond."

A-4693-17T4

According to the judge, Dr. Dyer opined, "without hesitation[,] that if [G.T.] was to be removed from [his] resource parents, he would be at risk" of "psychological harm, particularly now that he has reached two years of age where the attachment would generally have become even stronger." Dr. Dyer acknowledged "that he could not and would not offer any opinions regarding [defendant]" given that he never had the opportunity to meet her or conduct a bonding evaluation between her and G.T.[9] He also acknowledged that the "removal of a child between [twelve] and [twenty-four] months [was] somewhat of a gray area in terms of any harm caused by the removal even though a child can develop attachments during that time frame." However, he confirmed that in this case, because G.T. was "now beyond the [twenty-four]-month stage, . . . the harm of removal [could] be much more severe and enduring." He continued that "[t]his would be the case even if he was placed with a good caretaker, but

---

[9] According to the Division, a date for a bonding evaluation between defendant and G.T. was scheduled, but never occurred because defendant "had indicated that she . . . had no intention of coming back to New Jersey for any reason." In any event, Dr. Dyer opined that, given the fact that G.T. had "been with the resource family since early infancy and . . . had no contact with [defendant] from the time he was only several weeks old[,]" "no comparative bonding analysis was required because [defendant] would be a . . . 'complete stranger' . . . to [G.T.] at this time."

12

if he was placed with a poor caretaker, . . . 'the risk would be multiplied exponentially[.]'"

After reciting his factual findings, the judge applied the governing legal principles and concluded that "the Division ha[d] satisfied each prong of the best interest[s] analysis . . . by clear and convincing evidence." Regarding prong one, the judge determined that G.T.'s "health and safety were at risk" when he "was removed from [defendant's care] . . . because of the decompensating nature of [defendant's] mental health." According to the judge, defendant "has been unable and unwilling to provide [G.T.] with solicitude, nurture, and care ever since then."

The judge explained:

> While [defendant] did attend about eight to ten
> visitations in the spring of 2016, she had had no contact
> with the child since then and in the words of Dr. Dyer,
> is now a complete stranger to the child. She was in jail
> for a substantial period of time and when released,
> refused to return to New Jersey, but rather apparently
> violated her Delaware probation and went to Florida
> where she remained homeless. . . . There is no
> suggestion of any stability or permanency for the child
> without having any information on [defendant's]
> current status, but based on her incarceration,
> homelessness, [and] unstable . . . itinerant lifestyle,
> there is nothing to suggest that anything has changed in
> that regard.

A-4693-17T4

The judge continued that "[e]ven after her release from her Delaware incarceration, [defendant] showed no serious interest or effort in reuniting with [G.T.]," expressing instead to "the Division [case]worker in July 2017" that "she could not even take care of herself much less take care of her child." The judge stressed that "[c]urrently, her whereabouts are not even known and over the course of the last two years, she has not been available to provide the solicitude, nurture, and care needed by the child[,]" which "represents a harm in and of itself." See In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999) ("A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child.").

Turning to prong two, the judge elaborated:

> [Defendant's] actions since the removal clearly demonstrate she is not in a position to overcome harm to the child. She has made no plan suggesting that she can provide a stable and protective home for the child, and she has made no demonstrable efforts to overcome the cause for removal . . . .

The judge also credited Dr. Dyer's testimony that if G.T. was "removed from the resource family," with whom he had developed a "strong and healthy" attachment, he "would suffer serious emotional harm and be at risk for many emotional problems[,]" all of which "would have a negative impact and distort [G.T.'s] development." Moreover, the judge noted that "[s]ubstantial additional

time would be required" for defendant to be "assessed for her ability to parent safely." In that time, G.T. "would further suffer from the lack of any permanent placement" and "[a]ny further delays in permanency w[ould] simply add to the harm to which the child has been exposed." See In re Guardianship of K.H.O., 161 N.J. 337, 348-49 (1999) ("[U]nder [prong two], it may be shown that the parent is unable to provide a safe and stable home for the child and that the delay in securing permanency continues or adds to the child's harm.").

Turning to prong three, the judge determined that "[a]lthough the efforts did not prove successful in family reunification," he was satisfied that "the Division proceeded expeditiously in evaluating [defendant]" and the "services offered to the family were reasonable under the circumstances in attempting to correct the underlying issues that led to the removal of the child." See N.J. Div. of Child Prot. & Permanency v. N.C.M., 438 N.J. Super. 356, 368-69 (App. Div. 2014) ("The reasonableness of the Division's efforts 'is not measured by their success[,]'" and "[e]ven if the Division's efforts are deficient, the best interests of the child standard still controls whether termination is appropriate") (quoting N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012)). After detailing the services offered, the judge pointed out that the Division's efforts "in providing appropriate services have been hampered

15

throughout its involvement with this family by [defendant's] scattered and inconsistent contact with the Division," coupled with her "lack of cooperation[,] . . . extended periods of incarceration and disappearances."

Specifically, the judge noted that defendant did "not avail[] herself of the services the Division could have offered to her based upon the recommendations and conclusions" in the psychological evaluation conducted "in April 2016, shortly after [G.T.'s] removal." The judge also acknowledged:

> Although it is true that the Division did not pursue visitation when [defendant] was first incarcerated in Delaware, there were significant opportunities for [defendant] to pursue and participate in contact, communication, and visitation with the child after her release and the Division expressed its willingness to assist her in that regard. If returning to New Jersey for that visitation was problematic, she could have made an application to the court under the previous FN child services litigation for the child to be brought to her in Delaware. Instead, . . . she advised the Division she was in no position to care for the child and then she left for . . . Florida.

Further, the judge was satisfied that the Division "explored alternatives to termination of parental rights and . . . that there [were] no such alternatives." According to the judge, "the Division utilized reasonable efforts" in exploring potential placement options for G.T. provided by defendant. However, all four individuals were ruled out for appropriate reasons. Regarding defendant's

16

siblings, the judge explained that the fact that "the Division was not able to find any information on them despite having made a request [to C.T.] to provide that information d[id] not undermine the efforts taken by the Division." Additionally, the judge concluded that "kinship legal guardianship or any other alternative to termination of parental rights [was] not an option here because adoption [was] feasible and likely and clearly in the best interest of the child."

Finally, as to prong four, the judge was satisfied that "[t]erminating the parental rights of [defendant] . . . will not do more harm than good" as "there [was] no realistic likelihood that [defendant] will be able to safely and appropriately care for [G.T.] now or in the foreseeable future." The judge explained:

> [A]s evidenced by the record, [defendant] has not demonstrated the necessary stability and judgment necessary to care for her child. She has not participated in the necessary services to maintain contact with the child and remediate her situation. Her lifestyle choices have removed her from [G.T.'s] life for over two years, during which he has become bonded with [his resource] family and he clearly views [his resource parents] as the attachment figures in his life.

Relying on Dr. Dyer's opinion, the judge concluded that separating G.T. from his resource parents would place him "at risk of psychological harm even if placed with a good caretaker, and if placed with a poor caretaker, that risk[]

17

would be multiplied exponentially."  The judge stated that because defendant "has been unable to overcome the significant risks of harm to [G.T.,] and cannot offer anything in the way of a stable and protective home," defendant "must be viewed as a poor caretaker" who would therefore pose "a risk of serious and enduring harm" to G.T. if he was removed from his resource home and returned to her.  See N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 108 (2008) ("The 'good' done to a child in such cases in which reunification is improbable is permanent placement with a loving family," but "even in those situations, . . . the Division must show 'that separating the child from his or her foster parents would cause serious and enduring emotional or psychological harm'") (quoting In re Guardianship of J.C., 129 N.J. 1, 19 (1992)).  The judge entered a memorializing order, and this appeal followed.

On appeal, defendant argues the judge erred in finding that "[she] caused [G.T.] harm or will continue to harm [G.T.] in the future."  Defendant also contends that the judge erred in finding that the Division "offer[ed] [her] appropriate services[;]" "properly assess[ed] [C.T.]" and made "even minimal efforts to locate [defendant's] siblings" in order to "determine if they would be able to serve as placements" for G.T.; and fulfilled its "obligations to help [defendant] reunite with her son."  We disagree.

"It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support the decision to terminate parental rights." <u>N.J. Div. of Youth and Family Servs. v. F.M.</u>, 211 N.J. 420, 448-49 (2012). Here, the judge reviewed the evidence presented at trial, made detailed factual findings as to each prong of N.J.S.A. 30:4C-15.1(a), and concluded that the Division met, by clear and convincing evidence, all of the legal requirements for a judgment of guardianship. Contrary to defendant's assertions, the judge's factual findings are amply supported by the record, and his legal determinations are unassailable. The judge's opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a) and comports with applicable case law. <u>See, e.g.</u>, <u>F.M.</u>, 211 N.J. at 447-54; <u>E.P.</u>, 196 N.J. at 103-07; <u>K.H.O.</u>, 161 N.J. at 347-63; <u>D.M.H.</u>, 161 N.J. at 375-93; <u>N.J. Div. of Youth & Family Servs. v. A.W.</u>, 103 N.J. 591, 604-11 (1986). We thus affirm substantially for the reasons Judge Gaus expressed in his comprehensive and well-reasoned oral opinion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19                                                      A-4693-17T4