# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3565-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.R.,

     Defendant-Appellant,

and

THE BIOLOGICAL FATHER
OF B.R., WHOMSOEVER
HE MAY BE,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF B.L.R.,
a minor.

_____

Submitted May 6, 2024 – Decided May 15, 2024

Before Judges Marczyk and Chase.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FG-12-0046-22.

Jennifer Nicole Silletti, Public Defender, attorney for appellant (Catherine F. Reid, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Alicia Y. Bergman, Deputy Attorney General, on the brief).

Jennifer Nicole Silletti, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Jennifer Marie Sullivan, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

A.R. ("Ann")[1] appeals the Family Part's June 29, 2022 order terminating her parental rights to her biological daughter, B.L.R. ("Bea"), and granting guardianship to the Division of Child Protection and Permanency ("Division"). We affirm.

Ann gave birth to Bea in February 2021. Bea's father is unknown. Bea was immediately placed in the neonatal intensive care unit ("NICU") because

---

[1] We use initials and fictional names to protect the privacy interest of the child and the other persons involved. R. 1:38-3(d)(12).

she was unable to breathe on her own, required a feeding tube, and experienced repeated seizures.

A hospital staff member contacted the Division alleging Ann's mental health struggles, specifically her schizophrenia, as well as her homelessness, threatened Bea's wellbeing. Ann was known to the Division because her involvement dates to 2012, stemming from allegations of neglect, substance abuse, inadequate supervision, and failure to provide for the basic needs of her two older children, who were both subsequently placed in the custody of their respective fathers.

While still in the hospital, Ann told the Division she was not sure where she would go after discharge, and she was in the process of applying for housing and food stamps. She declined mental health services and stated she only sometimes took medication for her mental health. When Ann was discharged, she did not provide the hospital or the Division with an address or phone number and declined to make a follow-up appointment for herself.

Although Bea's condition improved, hospital staff determined she needed to be transferred to Children's Specialized Hospital. After some difficulty contacting Ann, hospital staff eventually obtained verbal consent for the transfer, but Ann declined to come to the hospital in person to complete the

3

necessary paperwork or to see Bea. The Division attempted to visit Ann at the address where she reportedly had been staying. Even after police officers were called for assistance, Ann refused to come to the door.

The Division continued its repeated attempts to contact Ann to inform her of Bea's status, obtain necessary consents, and arrange visitation, to no avail. The Division was first granted custody of Bea in April 2021, upon her discharge from the hospital, and Bea was placed in the care of unrelated resource parents, where she has lived since that time.

In the meantime, the Division contacted several of Ann's relatives in an attempt to identify a kinship placement option. Shortly after Bea was born, the Division contacted Ann's cousin, K.R., who stated she did not want Ann staying at her home, but she was willing to consider caring for Bea. When the Division visited K.R.'s residence in May, staff reported the apartment was dirty and unsuitable for Bea. The Division tried to assist K.R. with alternate housing arrangements and visited the home multiple times, but because the conditions largely remained unchanged, K.R. was eventually ruled out as a placement option in April 2022.

In March 2021, the Division contacted Ann's paternal aunt, L.W., who initially expressed interest in being a placement option for Bea, but then

4

withdrew. The Division also spoke with M.W., L.W.'s sister and Ann's aunt, who lived in North Carolina. The Division initiated the paperwork so North Carolina authorities could evaluate her. In August, North Carolina terminated the evaluation process due to M.W.'s unresponsiveness. The Division also contacted and ruled out as placement options Ann's sister, A.R., J.R., K.R.'s mother, and Ann's paternal grandmother.

In April and August 2021, Ann was incarcerated at Middlesex County Correctional Facility ("MCCF") for two separate offenses. Despite multiple visits by the Division, Ann either declined to meet with them or told the Division, "I want to give her up to the state," and stated there was no family member she wanted contacted about caring for Bea. In September 2021, Ann called the Division "in a highly agitated, manic state" claiming "there was a conspiracy against her at the jail." In later visits with the Division at MCCF, Ann "appeared disoriented . . . kept moving her head back-and-forth and could not maintain eye contact." Ann repeated her claims of a conspiracy, alleging prison officials were poisoning her, and stated she wanted all her children back.

Ann was released from MCCF in January 2022, and she contacted the Division asking for housing and a phone, stating she was in the hospital "because

there is a government conspiracy happening." After that call, the Division could not locate Ann for over two months, despite multiple attempts.

In March 2022, Ann contacted the Division and arranged a meeting for the next day, at which she told the Division she wanted housing and to get Bea back. She reported not being on medication and not having a steady place to live. The Division assisted Ann by arranging substance abuse and behavioral health evaluations. At the behavioral health evaluation, the provider diagnosed Ann with acute post-traumatic stress disorder and schizoaffective disorder, and suggested committing Ann to a psychiatric unit, but she refused and instead signed up for outpatient services. On the way back from the evaluation, Ann suddenly became aggressive while in a car with two Division workers, frightening them and requiring them to pull over and let Ann out at a gas station. Ann told DCPP she believed the behavioral health providers were in a conspiracy against her, and she stopped attending outpatient treatment. The Division attempted to arrange housing for Ann at a boarding house, but Ann was difficult to contact for follow-up or services.

In May 2022, Ann was re-incarcerated at MCCF in connection with robbery and contempt charges and was placed on a psychiatric hold. Ann believed she was being kidnapped and feared for her life in jail, claiming the jail

staff was poisoning her and feeding her expired and tainted food. She later mailed paint chips and pieces of the desk from her cell to Division staff as "evidence" of her poisoning claims.

In June 2022, the Division and Bea's resource parent brought Bea to supervised visitation at the jail. Ann spoke with Bea for approximately one minute before asking to speak with Division staff about her claims of being poisoned and endangered by jail staff. Ann canceled the next visit and asked for only Division staff to visit in the future. When Bea was brought for another visit in July, Ann again refused to see her.

Since her discharge from the NICU at two months of age, Bea has been in the care of unrelated resource parents. They completed medical training specific to Bea's needs, including administering her medication and watching for seizures and respiratory issues. When Bea was nine months old, she was referred for early intervention services based on delayed motor function and was later diagnosed with cerebral palsy. The resource parents' home was fully equipped for Bea's care, and her health continued to improve as the resource parents took her to all scheduled appointments, intervention services, and therapies, which were extensive. By all reports, Bea has thrived in her resource parents' care.

A-3565-22

The guardianship trial was held over intermittent days between April and June 2023. The Division presented two witnesses, Dr. Gregory Gambone, an expert in the field of clinical and forensic psychology, and a case supervisor from the Division. The case supervisor went through the history of the case, the Division's attempts to help Ann, and the resource parents' decision to pursue adoption over a Kinship Legal Guardian ("KLG") arrangement. No witness testified on Ann's behalf.

Dr. Gambone testified to evaluating Ann at MCCF on two occasions. He testified Ann misrepresented her history of involvement with the Division to him. He stated Ann told him she was the target of a government conspiracy. He further testified to Ann's diagnoses of schizoaffective disorder with paranoid delusions and dependent personality disorder with antisocial features as well as his diagnosis of schizophrenia and dysthymic disorder. He said that left untreated, schizoaffective disorder would worsen and impact Ann's ability to parent. Ann told him she had five different psychiatric hospitalizations over the course of the prior two years.

Dr. Gambone opined Bea would not experience emotional harm from termination of Ann's parental rights because their limited interaction meant there was no bond that would be affected by the termination. He opined Ann was not

able to provide a safe and stable home for Bea, and this inability could not be cured in the foreseeable future. He testified attempts to establish a parental bond between Ann and Bea would come at the expense of Bea's need for stability.

The court rendered its decision on June 29, 2023. After an analysis of the four prongs for termination set forth in N.J.S.A. 30:4C-15.1(a) and the Division's obligation to satisfy each by clear and convincing evidence, the court concluded Ann's parental rights should be terminated, setting forth its reasoning in both an oral decision and a corresponding written order.

The applicable law is clear. When terminating parental rights, the trial court applies the statutory best interests test, which requires consideration of four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

The Division must prove each prong by "clear and convincing evidence." N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 115 (App. Div. 2021). These four prongs are not discrete and separate; they overlap to inform a more general inquiry that the termination of parental rights is in a child's best interests. N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018). "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with that parent." N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J. Super. 228, 249 (App. Div. 2010) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008)).

As to the related first and second prongs of the statute, the trial court found the Division had established by lay and expert testimony that Bea's safety, health, and development has been and will continue to be endangered by the parental relationship and "is at a continuing risk of harm."

The court then found the Division established the third prong because it had "made attempts over the years to engage Ann in services," but Ann's actions "contributed to [Bea's] prolonged stay in resource care and her incapacity to

provide adequate care and her inconsistent role is, in and of itself, causing harm to [Bea] by delaying permanency[.]" The trial court concluded efforts to provide services and support have failed, and "there is no realistic likelihood that . . . [Ann] . . . would be capable of caring for [Bea] in the near future" and Ann was "unwilling and/or unable to eliminate the harm facing [Bea]." The court then found the Division's efforts to provide services and explore alternatives to termination were reasonable, as required by law.

Finally, under the statute's fourth prong, the court determined the evidence supported the order terminating parental rights. More specifically, the court held terminating the rights would not do more harm than good, "given Bea's right to permanency and safety." The court then granted the Division guardianship of Bea and terminated Ann's parental rights.

On appeal, Ann challenges the court's findings on prongs three and four of the statute. The Law Guardian sides with the Division in urging we affirm the court's decision.

Our scope of appellate review is limited. It is well established that in Title 30 cases we will not second-guess or substitute our judgment for that of the family court, provided its factual findings are "grounded in substantial and credible evidence in the record." <u>N.J. Div. of Child Prot. & Permanency v.</u>

11

D.C.A., 256 N.J. 4, 19 (2023). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). "We accord deference to fact[-]findings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). "[A] trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). We owe no deference to a judge's legal conclusions, which are reviewed de novo. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017).

"Parents have a constitutionally protected right to maintain a relationship with their children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007). That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." F.M., 211 N.J. at 447. In

guardianship and adoption cases, such as here, it is well-established that "[c]hildren have their own rights, including the right to a permanent, safe[,] and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004).

Ann first argues the Division did not provide her with meaningful or reasonable assistance because simply referring her to services would be unlikely to result in correction of the circumstances necessitating the Division's involvement in the first place, given her "mental health issues, homelessness, lack of interest in working with the Division, and frequent incarceration." She argues the Division should have instead focused its efforts on a KLG arrangement with either family members or Bea's resource parents.

"Reasonable efforts" described in the first part of the third prong are statutorily defined as

> attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure, including, but not limited to:
>
> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development, and health; and

(4) facilitating appropriate visitation.

[N.J.S.A. 30:4C-15.1(c).]

"The reasonableness of the Division's efforts depends on the facts in each case." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 435 (App. Div. 2001). The efforts "must by their very nature take into consideration the abilities and mental conditions of the parents" and may still be found reasonable even where "those efforts did not bear fruit." Id. at 442; see also In re Guardianship of D.M.H., 161 N.J. 365, 371 (1999).

The record is replete with documentation of the Division's efforts to work with Ann and connect her with services, inform her of Bea's progress, and facilitate visitation. Ann's repeated failures to cooperate with these efforts over the course of months and years is equally well-documented. For example, she constantly refused to take medication and stopped mental health treatment every time it was started.

Ann also argues the court erred in failing to consider alternatives to termination, as required by statute. She argues the court is "charged with preserving parental rights whenever possible" and recent changes to the law on

KLG require the court to make findings as to why KLG is not possible before terminating her rights.

The 2021 amendments to the KLG statute placed KLG and adoption on equal footing as permanency options. L. 2021, c. 154. The amendments altered N.J.S.A. 30:4C-15.1(a)(2), the second prong of the best interests test, but "left unaltered the first, third, and fourth prongs[.]" D.C.A., 256 N.J. at 25.

Ann's claim the court failed to consider alternatives to termination is also belied by the record. The court found, and the voluminous record reflects, the Division's exploration of alternatives to termination, specifically with respect to placement with a suitable relative, "on several occasions." K.L.W. reiterates, as the trial court stated on the record, "there is no presumption in favor of placement with relatives," but rather a responsibility that DCPP "at least first explor[e] available relative placements" before pursuing termination of parental rights. 419 N.J. Super. at 580.

Such exploration, with respect to K.R., L.W., M.W., A.R., J.R., and Ann's paternal grandmother, is well-documented in the record. The record also reflects the many difficulties the Division had with obtaining information about other kin, including from Ann, who repeatedly, albeit at times inconsistently, opposed the idea of Bea being placed with any of her relatives. By the plain language of

15

the statute, the Division is charged with researching suitable placements and assessing interested parties, not all possible candidates. See N.J.S.A. 30:4C-12.1(a). Nor can the court force a KLG arrangement on Bea's resource parents where their preference is to adopt the child.

Ann next contends the record did not support the trial court's assessment of Bea's best interests under the fourth prong, because the record did not include any non-hearsay evidence of the resource parents' understanding of KLG or their willingness to adopt Bea and the Division did not produce an expert evaluation of Bea's secure bond with the resource parents. Defendant also challenges the court's reliance on Bea's right to permanency under the fourth prong of the best-interests test.

Evaluation of the Division's proofs under the fourth prong of N.J.S.A. 30:4C-15.1(a)(4) "cannot require a showing that no harm will befall the child as a result of the severing of the biological ties." J.N.H., 172 N.J. at 478 (quoting K.H.O., 161 N.J. at 355). This prong can be satisfied by evidence "that the bond with foster parents is strong and, in comparison, the bond with the natural parent is not as strong[.]" N.J. Div. of Child Prot. & Permanency v. N.C.M., 438 N.J. Super. 356, 371 (App. Div. 2014) (quoting K.H.O., 161 N.J. at 363). The question is "whether, after considering and balancing the two relationships, the

child will suffer greater harm from the termination of ties with her natural parents than from permanent disruption of her relationship with her foster parents." K.H.O., 161 N.J. at 355. While a child's bond with the resource parents is an inappropriate consideration when evaluating parental fitness under the second prong, our Supreme Court has expressly held such evidence is appropriate for consideration under the fourth prong. D.C.A., 256 N.J. at 8-9.

It is unrebutted in the record that Bea, now three years old, has thrived in the home of the resource parents who have cared for her since she was discharged from the hospital at two months of age. She has only spent a handful of days with Ann over the course of her young life. The Division discussed and explained the differences between KLG and adoption with the resource parents, who opted to adopt Bea. The trial court reasonably concluded — as recommended by the Division and the evidence marshaled by the unrebutted expert report — that termination of Ann's rights would not do more harm than good. There is substantial credible evidence to support the court's decision as consistent with Bea's best interests.

To the extent we have not specifically addressed any other contentions raised by Ann, they lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3565-22