**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2819-19
A-2820-19

NEW JERSEY DIVISION OF CHILD PROTECTION AND PERMANENCY,

Plaintiff-Respondent,

v.

L.M.D. and C.F.S.,

Defendants-Appellants,

---

IN THE MATTER OF THE GUARDIANSHIP OF K.B.S. and C.S., minors.

---

Submitted May 5, 2021 – Decided July 7, 2021

Before Judges Ostrer, Vernoia and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0031-20.

Joseph E. Krakora, Public Defender, attorney for appellant L.M.D. (Beth Anne Hahn, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant C.F.S. (Dianne Glenn, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Salima E. Burke, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In these consolidated appeals, defendants L.M.D. (Laura) and C.F.S. (Carl) appeal from a Family Part judgment terminating their parental rights to their two daughters, K.B.S. (Kira), age four, and C.S. (Cara), age two.[1] Defendants contend the court erred by finding the Division of Child Protection and Permanency (the Division) presented clear and convincing evidence satisfying each prong of the best-interests-of-the-child standard embodied in N.J.S.A. 30:4C-15.1(a). Laura also argues the court erred by relying on hearsay

[1] We employ initials and pseudonyms to protect the privacy of the parties and for ease of reference. R. 1:38-3(d)(12).

embedded in a Division caseworker's investigative summary that was admitted into evidence without objection and with defendants' consent. Unconvinced by defendants' respective contentions, we affirm.

I.

A.

Kira was born prematurely to defendants in December 2016 and was discharged from the hospital on March 26, 2017. On June 26, 2017, the Division received a referral that Kira was taken via ambulance to Newark Beth Israel Medical Center (BIMC) with "seizure-like" symptoms. BIMC concluded Kira suffered from "bilateral acute subdural and subarachnoid hemorrhages," retinal hemorrhages, and a "healing nondisplaced [humerus] fracture."

Carl informed a Division investigator that shortly after defendants and Kira had arrived home on the evening of June 25, "he observed" Kira on the bed "shaking her head and . . . saliva [was] running down her head." He said "he thought [she] was choking," so he "patted her on her back" and "suctioned the phlegm out [of] her mouth and nose." Laura claimed she was not present when Carl first saw Kira shaking; she arrived "about [two] minutes" later; Carl "advised her . . . [Kira] was not responding"; and Carl "laid [Kira] on the bed," "sucked the [mucus] out[,] and told [Laura to] call the ambulance." The

investigator inquired if there was any history of trauma, and defendants advised that about "a week prior," they were driving with Kira and "were almost hit by another vehicle." They explained Kira's "car seat was not clicked in all the way," and when Carl "veer[ed] right to avoid an impact," her car seat "rolled forward[,] leaving [Kira] upside down underneath."[2]

On June 30, 2017, Carl "completed a [v]ideotaped [i]nterview [s]tatement" with a detective from the Union County Prosecutor's Office, and, for the first time, reported "that he shook [Kira] for five seconds when she wasn't breathing." Using a doll, he demonstrated how he shook Kira.

On July 12, 2017, the court entered an order granting the Division care, custody, and supervision of Kira. The order also granted defendants supervised visitation. Kira was discharged from the hospital on July 17 and placed by the Division into the home of her current resource parent, E.A. (Emily).

In an October 2017 report, Dr. Monica Weiner of the BIMC Metro Regional Diagnostic and Treatment Center (RDTC) stated she found "no . . . organic medical causes . . . for [Kira's] . . . hemorrhages, leaving

---

[2] Laura "reported [Kira] . . . had no marks, cuts, bumps[,] or bruising" following the alleged near-car-accident, and, "because she appeared well," defendants did not take her to a doctor. Laura also said she and Carl took Kira "to the pediatrician on [June 20, 2017]" but did not "report the incident . . . because [the pediatrician] reported . . . [Kira] was well."

trauma as the [only] explanation." She opined the "trauma occurred within [hours to days] of [Kira] presenting to []BIMC," and that "the timing of [Kira]'s symptoms" rendered the near-car-accident "less likely to be the cause of her hemorrhages." She also determined that "if done with more force, the mechanism of shaking as [demonstrated] by [Carl was] consistent with [Kira]'s . . . hemorrhages."[3] She concluded "[t]he signs of healing" in Kira's humerus were "too recent for the . . . injury to have been caused by the [near-accident]," but Carl could have "possibl[y]" caused the injury by "roll[ing over]" on Kira in bed.

Dr. Weiner further advised there were "bruises . . . on the backs of both of [Kira's] . . . ears" and "small scratches or indentations behind [Kira's] left ear." She reported these injuries would result from "pulling or twisting the ear or [from] direct impact"; that defendants provided "no explanation" for the injuries; and that the injuries "should be considered . . . inflicted." At a

[3] Dr. Weiner found "[t]he shaking mechanism [demonstrated by Carl] would also explain [Kira]'s later episodes of apnea and seizures" at BIMC. She additionally noted neither defendant reported Kira hitting her head during the near-car-accident, and that, during Kira's three-month admission to BIMC following her birth, BIMC performed "three head ultrasounds and multiple retina exams [on Kira] which did not reveal any hemorrhages."

November 2, 2017 hearing, the court continued the Division's care, custody, and supervision of Kira.[4]

In December 2017, Carl voluntarily waived his right to a fact-finding hearing and stipulated to "a finding of abuse or neglect pursuant to N.J.S.A. 9:6-8.21(c)." Specifically, he stipulated: (1) "he held [Kira] by her upper body and shook her," and "Dr. Weiner concluded . . . [this] mechanism of shaking would cause" Kira's head injuries; and (2) "on June 22, 2017, he awoke to find his arm . . . on top of [Kira]," and "Dr. Weiner opined . . . this . . . could have resulted in [Kira's] bone fracture." The Division determined the allegations of abuse or neglect against Laura were not established.

In December 2017 and January 2018, Dr. Eileen Lopez-Alonso conducted her first of four psychological evaluations of defendants. She concluded defendants "responded to [self-reported testing measures] in such a way as to portray [themselves] as exceptionally free of the common shortcomings to which most individuals will admit"; their responses were associated with "either an overt attempt to give socially desirable responses . . . to create a positive image or . . . a denial of even minor faults because of excessive concern [of] the

[4] The court's November 2, 2017 order continued defendants' supervised visitation and required the Division to assess relatives of defendants for placement.

consequences"; and their response styles likely indicated "an underreporting of symptoms."

Dr. Alonso stated that "[o]f most concern [were Kira's] unexplained injuries"—particularly to her ears—and defendants' "lack of [explanation] . . . limit[ed her] ability to comprehensively identify risk factors in this case." She found that "[w]ithout identifying the risk factors that exposed [Kira] to injury, she remain[ed] at risk." She noted that Laura's test scores and delay in getting Kira treatment "indicate[d] a need for parenting education," and she recommended defendants "attend domestic violence counseling,"[5] "have more frequent [supervised] visits with [Kira] . . . to promote bonding" until therapeutic visitation could be achieved, and "be re-evaluated" "[p]rior to any changes in visitation."

At a March 2, 2018 hearing, the court continued the Division's care, custody, and supervision of Kira, and required that the Division provide defendants with "more frequent[,] . . . therapeutic visit[ation]." Defendants participated in therapeutic visitation through Tri-City People's Corporation (TCPC) from March to April 2018. Toni Caldwell, Executive Director and CEO of TCPC, reported "[t]here was no evidence of negative or harmful behavior

5 Defendants reported prior incidents of domestic violence.

exhibited in any visit" and defendants "presented as loving and engaging parents." She "recommend[ed] . . . reunifi[cation]."

On May 3, 2018, Emily wrote to the Division advising of her "desire to adopt" Kira. The Division provided her with an "Adoption and Kinship Legal Guardianship [(KLG)]" "[f]act [s]heet of [d]ifferences." On May 10 and 15, defendants began domestic violence counseling at the Clinic for Youth & Family Solutions (CYFS).

Laura gave birth to Cara on May 18, 2018 at Clara Maass Medical Center (CMMC). As a condition of permitting Laura to retain custody of Cara, the Division implemented a safety protection plan requiring Carl to "leave the home" and prohibiting him from visiting Cara outside of the presence of a relative or one of the parenting aides supplied to defendants. On May 24, 2018, the court entered an order granting the Division care and supervision of Cara, and continuing the Division's care, custody, and supervision of Kira. The court's order incorporated the safety protection plan and required that the Division incrementally increase defendants' individual unsupervised visitation with Kira.

Dr. Alonso conducted her second set of evaluations of defendants in June 2018. Prior to the evaluation, Dr. Alonso contacted Caldwell and Olawakemi Abulude, one of the parenting aides supplied to defendants, "to gain a better

understanding of [how defendants] were presenting . . . and what their progress had been." Dr. Alonso advised that Caldwell and Abulude "[b]oth . . . reported . . . [defendants] were very appropriate, . . . engaged, . . . [and] consistent in treatment services[,] and [both] spoke very highly of [defendants]."

Dr. Alonso again found defendants "attempted to portray [themselves] as relatively free of the common shortcomings to which most individuals will admit," and their responses indicated an "underreporting of symptoms." She acknowledged defendants "were . . . receiving ongoing individual domestic violence counseling," and they "received positive reviews from their . . . therapists" and "reported gains from the services." She recommended that "[s]upervision for [Cara] . . . be gradually removed"; defendants begin "supervised overnight weekend visits with [Kira]"; defendants "continue domestic violence counseling"; and that, once they completed counseling, they begin "unsupervised overnight weekend visitation with [Kira]," with "gradual[] increase[s]" to "result in reunification."

On June 22, 2018, the court returned full custody of Kira to Laura. The court's order provided Carl could be "reunified fully with the family . . . once [defendants] complete[d] domestic violence counseling," which they did in July

2018. The Division then "permitted [Carl] to move back in[to] the home." On July 26, 2018, the court entered an order "transferring . . . [full] custody of [both] children . . . to [defendants] jointly."[6]

B.

Just over two weeks later, on August 13, the Division received a referral from CMMC that Cara was brought to the ER with a "fracture of her left femur." The caller reported Laura was "unaware of any injuries to [Cara]," and defendants "[did] not have any explanations."[7] Cara was transferred to BIMC on August 14, where additional testing by the RDTC revealed she also suffered "subacute subdural hemorrhages on both sides of her brain."

Defendants provided various accounts of the potential cause of Cara's fractured femur when questioned at different times by hospital personnel, the Division, and in a recorded video statement with a detective from the Newark Police Department (PD). The accounts included: (1) "[Kira] could have tugged on [Cara]'s leg while [Cara] was in the swing"; (2) "[Kira] fell and landed on [Cara]'s waist" while Laura was with the children and Carl was "in the shower"

---

[6] The order noted the "transfer[ of] . . . custody [was] . . . effective as of July 18, 2018."

[7] The reporter advised Cara "[did] not appear to be in pain," and she was "eating and acting normal[ly]."

on August 12; (3) "[Kira fell] on [Cara] on a separate occasion" "a week prior"; and (4) Laura injured Cara while "turn[ing] her" in her bassinet on August 12. Defendants "denied noticing [Cara]'s leg being swollen" prior to August 13. Dr. Weiner "requested" that the Division not question defendants "regarding [Cara's] head trauma" because the RDTC discovered Cara's head injuries "after [defendants' v]ideo [s]tatements with [the] Newark [PD]."[8]

On August 14, 2018, the Division conducted a Dodd removal of the children.[9] The Division returned Kira to Emily's care, where she remained throughout the guardianship litigation. The Division placed Cara in Emily's care when the child was discharged from the hospital on August 29, but on September 21 the Division placed Cara into the care of her current resource parents, where she remained throughout the trial. In November 2018, Cara's resource parents wrote to the Division advising of their "intention to adopt" Cara. Following the

---

[8] A Division investigator attempted to meet with defendants concerning Cara's head trauma on December 11, 12, and 13, 2018. The Division noted defendants "initially agreed to meet [the] investigator" but "did not show up" to the meetings, and "[d]uring a . . . telephonic contact on" December 14, defendants "decline[d] to be interviewed" further without counsel present.

[9] A "Dodd removal" is an emergency removal of a child from the custody of a parent without a court order, as authorized by N.J.S.A. 9:6-8.29 of the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

children's August 14, 2018 removal, the Division provided defendants with weekly supervised therapeutic visitation through Family Connections (FC).

Dr. Weiner issued another report in December 2018. She opined that Cara's fractured femur "was caused by force directed at the bone at an angle, potentially with a twisting mechanism," and because "[t]he femur is the largest bone in the body[,] . . . to break it would take more than the usual amount of force needed to manipulate an infant's legs for normal care." She reported, "[w]ith a femur fracture, [Cara] would not have been able to move her leg or have her leg moved without significant obvious distress," but Dr. Weiner noted, based on her review of defendants' recorded video statements and Division contact sheets, that Laura "reported [Cara] . . . was well on" August 11; Laura reported she changed Cara with only "the usual amount of crying" on August 12; and defendants "reported . . . [Laura] first noticed . . . [Cara]'s leg was hard and/or swollen during [a] diaper change at approximately 2:30 [a.m.]" on August 13. Dr. Weiner stated "[s]welling after a fracture can take [minutes to hours] to become noticeable[,] but [it] would not be obvious instantly." She concluded "[i]f [Cara]'s leg was swollen and 'hard' at 2:30 [a.m. on August 13], the fracture occurred before [then]." Thus, she opined "none of [defendants']

explanations . . . reasonably account[ed] for" Cara's injury, and "physical abuse [w]as the [only] explanation."

Dr. Weiner found Cara's "hemorrhages [were] . . . older than [twenty-four] hours but less than three weeks old," and Cara "did not have any signs or symptoms of . . . organic causes," nor "were [any] reported." Dr. Weiner stated "[n]on-medical causes of [Cara's] hemorrhage[s] include various types of head trauma," including "[d]irect impact or acceleration-deceleration trauma." Because defendants did not report "accidental head trauma," Dr. Weiner concluded "abusive head trauma" was "the [only] explanation." She recommended defendants have only "closely supervised" visitation with the children.

On April 5, 2019, defendants waived their rights to a scheduled fact-finding hearing and stipulated to the Division's allegations of abuse. At that time, Laura offered Carl's mother, O.T. (Ollie), for placement of the children.

Dr. Alonso conducted her third set of evaluations in May 2019. When she questioned Laura about Cara's injuries, Laura reported for the first time that the family "visit[ed Carl's] family in New York" about a week prior to the referral; "she had just met [Carl's] family that day"; and Carl's "cousins . . . took [Cara] to another room" for approximately "[thirty to forty] minutes." She claimed she

"check[ed] on [Cara] every [fifteen] . . . minutes" during that time. She also "reported . . . [leaving] Cara with [Carl]'s mother." She said that because "this was the first time she met [Carl]'s family[,] . . . she did not want to leave [the] children alone with them[,] but [she] did so anyway." She stated she "did not" "note[] any injuries . . . or . . . change[s] in [Cara's] behavior after the visit to New York," but Cara "was not lifting her leg as high while . . . in New York." Laura claimed she "notic[ed] . . . [Cara]'s leg was 'kind of hard' [two to three] days after the . . . trip."

Laura also "reported . . . [Kira] fell and landed on [Cara]'s head" while Laura was "chang[ing Cara]" about "three days before" the referral. Laura further advised Kira "sat on [Cara] . . . two days before the hospital"; Laura may have hurt Cara "four days" before the referral by "turn[ing Cara] quick[ly]" when Cara was vomiting; and "a few days before" the New York trip, Laura "had a seizure [while] . . . holding [Cara on the sofa]" and Cara "fell."[10] She advised that on the morning of August 13, Cara "was not moving her leg as much as . . . the week before" and "it looked like [her leg became] swollen overnight."

[10] Laura advised "she experiences unpredictable seizures," she is actively being treated by a doctor, and she "never forgets to take" her medication.

Carl "also reported . . . the family had visited his family . . . the week prior[,] and []his report was consistent with [Laura]'s." He said Cara "never fell [while in New York] because she never cried." He stated he did "not . . . [tell] the detective about the trip . . . because he and [Laura] thought about it afterwards." He "reported noti[cing] . . . [Cara]'s leg was swollen . . . three hours before taking her to the hospital." Dr. Alonso reported Carl had "no explanation" concerning "the position" of Cara's fracture, nor did he have an explanation for "[Cara]'s brain injury."

Dr. Alonso concluded defendants' responses to test items again "indicated [defendants] . . . attempted to portray [themselves] as relatively free of the common shortcomings to which most individuals will admit"; their responses were "indicative of [defendants being] . . . generally satisfied with themselves and see[ing] little need for major changes in their behavior"; and their responses "likely underrepresent[ed] the extent and degree of significant test findings."

Dr. Alonso opined Laura's "reported decision to . . . [leave Cara] in the care of individuals she had just met and [Laura] not having changed her behavior to protect [Cara] from [Kira] falling on her multiple times indicate[d] poor judgment and negligence." Dr. Alonso acknowledged defendants "completed recommended services, presented well, and received positive reviews

from . . . treatment providers" following Kira's injury, but she noted, "[d]espite this, [Cara] was discovered to have [similar] unexplained injuries in August 2018"—less than one month after defendants' reunification with Kira. She opined "[i]t is possible . . . [defendants] presented well during treatment but were not forthcoming and/or did not openly participate in treatment."

Dr. Alonso found defendants "repeatedly presented as guarded" and "demonstrated positive impression management," and that, while "some degree of positive impression management is not uncommon," defendants "also presented new information and exhibited some inconsistency in their reports[,] which indicate[d] . . . they have not been forthcoming." She concluded "[c]hronic patterns of serious injury to the children . . . and lack of explanations persist"; "the risk factors that led to [the children]'s injuries continue to be present and have not been identified or controlled for"; "[a]s long as [defendants] continue to present as guarded about the circumstances that led to the[] children being injured, it is difficult to make any recommendations that would lead to . . . change substantial enough to reduce the risk of harm [to] the

children . . . if placed in their care"; and "[a]s long as these dynamics exist[], reunification cannot occur."[11]

On July 17, 2019, the court approved the Division's plan of termination of defendants' parental rights followed by adoption. In August 2019, defendants began couple's counseling with the Youth Development Clinic (YDC). YDC did not note "any pressing concerns" with defendants' "relationship" or "ability to parent." On August 26, Laura first advised a Division caseworker that Cara had "slept in the same bed as [Ollie]" while in New York, and the next day "her leg was visibly swollen," and she could not lift it. Carl confirmed Cara slept with Ollie, and he said Ollie "is an evil person" and that he had not communicated with her for eight years before the visit.

The Division filed its guardianship complaint in August 2019. On September 12, the court dismissed the Title Nine litigation.

The Division assessed and ruled out several of defendants' relatives for placement of the children, including Ollie; Laura's father, W.D.; Laura's grandmother, M.R.; and Carl's aunt, I.M., none of whom appealed from the Division's rule-out decisions. The Division also considered Laura's sisters, C.D.

---

[11] Dr. Alonso recommended defendants "continue . . . supervised therapeutic visits" with the children; "be referred for individual psychotherapy" and "couples counseling"; and "be re-evaluated prior to any changes in supervision."

(Christine) and Y.D. (Yara), for placement. In July 2019, the Division began assessing Christine, who expressed a willingness to adopt both children. Yara supported placement of the children with Christine but advised the Division she would adopt the children if Christine was not approved. While the Division was assessing Christine, she added her boyfriend as a prospective household member, which delayed the process. She restarted the process without the boyfriend in December 2019 and was being assessed at the time of the guardianship trial. The Division provided the children's resource parents with periodic updates on its efforts to place the children with relatives.

Dr. Alonso performed her fourth set of evaluations in October 2019.[12] Laura reported she let Cara sleep with Ollie because Ollie "begged" defendants. Laura stated she did "not feel[] like [she] should, but [she felt] bad telling [Ollie] no."[13] She claimed that the next morning she noticed Cara's leg "wasn't going up as high." She explained she "thought of this from the very beginning" but she did not report it earlier because she "didn't want to make someone feel bad

---

12 Carl returned to individual counseling in October 2019. In February 2020, Carl's clinician found Carl "seem[ed] to . . . understand[] . . . what is considered inappropriate parenting," and she opined "[i]t would be beneficial for [Carl] to apply skills learned [in] therapy and continue working o[n] goals."

13 Laura reported Carl said he did not "think [Ollie would] hurt [Cara]."

or give them problems." Carl advised "that two days after arriving home from New York, he noticed . . . [Cara]'s leg was swollen."[14]

Dr. Alonso concluded that even accepting Laura's and Carl's accounts concerning Ollie, they "place[d Cara] in a position that from parenting standards, they knew not to." Dr. Alonso noted Laura "reported a willingness to place her child at risk . . . to not hurt someone's feelings and then withheld information to protect an individual she reportedly suspected of having caused severe harm to her child." Dr. Alonso opined "[t]his indicate[d] very poor judgment . . . [and] ongoing parenting deficits that raise [a] risk of harm . . . and provide[] evidence [of defendants] . . . not having been forthcoming in the past."

Dr. Alonso noted defendants "expressed a strong desire to be reunified with their daughters and pointed to their consistent attendance in treatment services as a sign of their commitment," but she found:

> Both [defendants] also reported mishandling their children (shaking [Kira] in response to her reported seizure in 2017, [Kira] falling on [Cara] multiple times while in their care, [Laura] dropping the children more than once and concealing this information) and continued to present new and contradictory information regarding the circumstances surrounding . . . the[]

[14] Carl also advised Dr. Alonso that Laura recently stated "she fell asleep on a couch . . . with [Kira] and [Kira] fell" about a week before her hospitalization. Laura did not advise Dr. Alonso about this incident.

> children's injuries without adequate explanation as to why this information was previously omitted.

Dr. Alonso explained defendants continued to present with a "significant degree of impression management," which was "in line with [their] guarded presentations during . . . previous . . . evaluations" and was indicative of an "underreporting" of symptoms.[15] She found defendants' "continue[d] . . . lack of disclosure[,] and [their] distortion and minimiz[ation of] their involvement in the children's injuries," reflected "that they have been unable to ameliorate the risk of harm present to the[] children." She noted, "[d]espite consistent participation in treatment services and . . . positive reviews from . . . service providers" following Kira's injury, "[Cara] was inflicted with non-accidental harm and sustained similar severe injuries . . . while in [defendants'] care." Based on her evaluations and reports from service providers, Dr. Alonso found defendants "both have a fair to good understanding of child rearing practices," but she opined this "understanding . . . does not translate into their behavior and history of parenting with their children."

Dr. Alonso concluded:

---

[15] Dr. Alonso noted that when she "asked [Carl] what he would change to ensure his daughters' safety," he replied, "The best I would do would be to put cameras in my home" and "car . . . . After that, I don't know." She reported Laura "provided no plan for ensuring the safety of her children."

> [Although t]reatment ha[d] been provided based upon the issues presented by [defendants,] . . . they are not engaging appropriately so that treatment can be effective. Instead of focusing on ameliorating the risk of harm to their children, they have used treatment services as an opportunity to present themselves in whatever light they believe will appease their providers and to promote the idea of being a model parent. There appear to be characterological problems of presenting one way while behaving another. These characteristics and long-standing deficits are unlikely to be remediated in the foreseeable future.
>
> These children have experienced severe physical abuse. There is now a pervasive pattern of severe and imminent risk of harm for these children being placed in [defendants'] care. There is a notable discrepancy between the reports of [defendants'] supervised contact with their children and the children's treatment while in [defendants'] unsupervised care. The risk here is not one of lack of parenting knowledge[;] it is one of violence against the children being perpetuated in spite of knowledge of parenting.

In October 2019, Dr. Alonso conducted bonding evaluations of the children with defendants and with their respective resource parents. She found that "while [Kira] appear[ed] to at times enjoy playing with [defendants], she is not securely attached to them and does not view them as a primary source of nurturing." However, she noted "[Kira] appeared to be very attached to her resource parent." She explained Kira "sought . . . out [her resource parent] . . . after falling during the observation" and when her resource parent

left the room, and "[Kira] and her resource parent physically touched and hugged throughout the observation." She concluded Kira "view[s] her resource parent as . . . a significant and central parental figure and is securely attached to her." She "opin[ed,] . . . within a reasonable degree of psychological certainty[,] that if [Kira is] . . . separated from her psychological parent, she would suffer a traumatic loss that would produce significant and enduring harm." She also noted Kira's resource parent "reported . . . she [was] aware of the importance of the sibling bond and [had] already . . . taken steps to ensure this relationship."[16]

Dr. Alonso noted Cara "appear[ed] to have a positive relationship with [defendants] and her resource parents." However, she found, "[g]iven [Cara's] young age, early separation from [defendants], and [Dr. Alonso's] observations during the . . . evaluation, [Cara] seem[ed] to be on a trajectory towards developing a secure attachment with her resource parents." She "opin[ed,] . . . within a reasonable degree of psychological certainty, that if [Cara] were to be separated from her psychological parent[s], she would demonstrate an emotional reaction that would likely manifest in the form of developmental regressions." She stated "that given the right circumstances,

[16] Dr. Alonso noted that at the bonding evaluation, "[Kira]'s resource parent reported . . . she is committed to adoption."

[Cara] might be able to over time recover from the loss of her resource parents," but "the data [did] not suggest . . . [defendants] could mitigate the anticipated harm." Thus, she found "[r]eturning [Cara] to [defendants'] care would be placing [her] at risk of harm." She concluded "[p]reserving [Cara]'s relationship with her only consistent caregiver[s]"—her resource parents—"would likely serve to mitigate any reaction she may experience through the loss of" her relationship with defendants.

Dr. Alonso determined defendants are "unlikely to become a viable parenting option for [Kira] and [Cara] in the foreseeable future," and the children "would be well[-]served by achieving permanency through adoption." She opined "to do so would produce more good than harm."

At the guardianship trial, the Division presented testimony from Dr. Weiner, Dr. Alonso, and a Division caseworker. Dr. Weiner, who was qualified as an expert in medicine and pediatric child abuse and neglect, testified none of defendants' explanations "reasonably account[ed] for [Cara's] femur fracture."[17] She explained Cara's particular fracture required "more force" and was "even more associated with abuse." She testified Laura's account of turning Cara in

[17] Dr. Alonso also advised that while Kira rolling off the couch a week before her hospitalization could "[p]otentially" account for her humerus fracture, it would not explain her "neurological symptoms" a week later.

her bassinet did not indicate the presence of "enough force" to cause her injury; the injury could not have resulted from Kira pulling on Cara's leg or from Cara hurting herself in her swing; and that, while it was not "impossible" for Kira to have broken Cara's femur by falling on her, Cara's normal behavior following the incident as reported by defendants indicated she suffered the injury after that alleged event. Dr. Weiner likewise stated that if Cara had suffered the injury in New York "a week before she was admitted to the hospital," or when Laura dropped Cara during a seizure prior to the New York trip, "it would have been noticeable that [Cara's] leg was bothering her" during the numerous diaper and clothing changes Cara "had to go through in a week leading up to her admission [to BIMC]."

Dr. Weiner opined Cara's injury was "inflicted" by "some adult caring for her [being] angry, frustrated, [or] distracted, . . . and . . . grabb[ing] her leg and . . . twist[ing] or hit[ting] it." She also testified that while a fall could cause a subdural hemorrhage, it would be "very unusual" for a fall to do so without "an accompanying skull fracture," which Cara did not have.

Dr. Alonso, an expert in psychology, testified concerning her reports. She explained defendants offered "no plan to ensure the safety of the children, . . . the narrative . . . continued to change," and defendants "had not

been forthcoming." She acknowledged the positive reports concerning defendants provided by service providers, but concluded that although defendants behaved appropriately with the children "under supervision," "when the supervision is removed[,] . . . [the children] are seriously injured."

Dr. Alonso further testified the children have been harmed by a lack of permanency. She explained that "[b]ecause there [is] no other alternative for permanency at this time" and "[t]he only opportunity for the [children] to achieve stability [is] with their resource parents," the children's best interests would be served by termination of defendants' parental rights followed by adoption by the children's respective resource parents. She concluded doing so "would produce more good than harm."

The Division caseworker testified about the various services the Division provided defendants and the Division's interactions with defendants. The caseworker noted the Division was still assessing Christine. She testified both children's resource parents were committed to adoption; Kira had lived with her resource parent for about two-and-a-half years in total; Kira was happy with her resource parent; and her resource parent was attending to her needs, including "special needs" such as early intervention services. The caseworker also testified Cara had lived with her resource parents since approximately

September 2018 and was "very loving" toward her resource parents. The caseworker noted both children's resource parents were committed to maintaining the sibling relationship.

The court found each of the Division's witnesses credible. The court also admitted into evidence eighty-two exhibits at the Division's request and with defendants' consent, including an investigative summary prepared by a Division investigator describing defendants' recorded video statements with the Newark PD following Cara's injuries, and the expert reports referencing the Division's documentation. Laura and Carl did not testify, nor did they present any witnesses.

Based on this record, Judge Garry J. Furnari found, in a comprehensive oral decision, the Division proved, by clear and convincing evidence, that:

> (1) The child[ren]'s safety, health[,] or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent[s are] unwilling or unable to eliminate the harm facing the child[ren] or [are] unable or unwilling to provide a safe and stable home for the child[ren] and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child[ren] from [their] resource . . . parents would cause serious and enduring emotional or psychological harm to the child[ren];

> (3) The [D]ivision has made reasonable efforts to provide services to help the parent[s] correct the circumstances which led to the child[ren]'s placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a); see also N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 604-11 (1986).]

To support his findings that the children's "safety, health[,] or development has been or will continue to be endangered by the parental relationship," N.J.S.A. 30:4C-15.1(a)(1), and that defendants are "'unwilling or unable to eliminate the harm' that . . . endangered the child[ren]'s health and development," In re Guardianship of K.H.O., 161 N.J. 337, 352 (1999) (quoting N.J.S.A. 30:4C-15.1(a)(2)), the judge noted, "[t]hroughout [the] litigation, [defendants] provided conflicting [and] contradictory accounts as to when and how [Cara]'s leg was injured," and that "Dr. Weiner concluded . . . none of the explanations provided by [defendants] reasonably accounted for . . . [Cara's] leg [injury] . . . and the only explanation was physical abuse." Judge Furnari also found "neither [defendant] . . . provided an explanation as to how [Cara's head injuries] occurred," and the judge relied upon Dr. Weiner's conclusion that, "because no accidental head trauma explanation was provided," the nature of

Cara's injuries left "non-accidental[,] . . . abusive head trauma . . . as the only explanation." The court found these circumstances and explanations presented "clear indications of actual physical abuse to the child."[18]

The judge also relied on Dr. Alonso's opinion that although defendants "had learned about . . . parenting skills" through Division resources, and "both have a fair or good understanding of child rearing practices," "this understanding . . . did not . . . translate into behavior and history of parenting with their children." Based on this evidence, the judge determined that "[t]he risk . . . is not one of a lack of parenting knowledge," but rather "[i]t is one of violence against children being perpetrated in spite of the knowledge of parenting."

Judge Furnari explained one of his "most significant findings" on the first two prongs of the N.J.S.A. 30:4C-15.1 standard was that "[t]reatment [was] . . . provided to [defendants] based on issues presented by [them]," but "they have not engaged appropriately so that any treatment could be effective." The judge based this finding in part on Dr. Alonso's opinion that "[i]nstead of

---

[18] The court also found Carl "admits or at least somewhat admits . . . he [injured Kira] by . . . shaking [her]" and by "partially rolling over on [her] in her sleep," and concluded "[t]hese actions . . . unquestionably constituted harm to [Kira]." See K.H.O., 161 N.J. at 352 ("[T]he harm . . . must be one that threatens the child's health and will likely have continuing deleterious effects on the child.").

focusing on ameliorating the risk of harm to the children, [defendants] . . . used treatment services as an opportunity to present themselves in whatever light they believe[d would] . . . promote the idea of being . . . model parent[s]," and that defendants' "continue[d] . . . lack of disclosure[,] and [their] distortion and minimiz[ation of] their involvement in the[] children's injuries," rendered it "difficult to make any recommendations that would . . . reduce the risk of harm [to] the children."

The judge therefore concluded defendants harmed the children; defendants failed to "address the[] issues" that led to the children's harm; and defendants are thus unwilling or unable to "remediate[] the risk of harm" to the children "in the foreseeable future."

Concerning prong three of the statutory standard, the judge found "[t]he Division . . . made reasonable efforts to help [defendants] correct the circumstances that led to the child[ren]'s removal," see N.J.S.A. 30:4C-15.1(a)(3), "by providing a plethora of services to the family[,] including: psychological evaluations, substance abuse assessments, domestic violence referrals, individual and couple's therapy, parenting skills [training], visitation, parent aide services, relative assessments, family team meetings, [and] drug screen[ings]." Judge Furnari opined "the problem has not been the

reasonableness of the services"; "[i]t is [defendants] that are the problem" because they continuously "fail[ed to] . . . appropriately permit the services that [were] provided to provide them with assistance."[19] The judge further found that "despite the offering and provision of the services[,] neither parent is in a position to care for [the children], nor will they be able to do so in the future."

Lastly, the judge found termination of defendants' parental rights would not do more harm than good. See N.J.S.A. 30:4C-15.1(a)(4). The judge based his determination primarily on Dr. Alonso's bonding evaluations, which he found revealed Kira "is not securely attached to . . . [defendants] and does not view them as central parental figures" but she "is securely attached to her resource parent[]"; Kira "would [likely] suffer . . . severe and enduring harm if her relationship with the resource parent[] is severed," which defendants "could not mitigate"; Cara "would likely suffer harm if [her] relationship with her resource parents is severed" that defendants are "unable to mitigate"; and

---

[19] The court also found "adoption of the child[ren must be] neither feasible nor likely in order for KLG to be [an] appropriate" alternative to adoption, and "[b]oth . . . [children]'s" resource parents are "firmly committed to adopti[on]." See N.J.S.A. 3B:12A-1(c) (providing KLG is only appropriate "where adoption is neither feasible nor likely").

"[Cara]'s resource parents would be able to mitigate any harm" caused by "termination of [defendants'] parental rights."[20]

The judge entered an order terminating defendants' respective parental rights to Kira and Cara.[21] On appeal, defendants argue the Division did not sustain its burden of proving by clear and convincing evidence any of the four prongs of the best-interest standard. Laura also argues Judge Furnari erred by basing his findings on "incompetent testimony and evidence." The Division and the children's Law Guardian argue the guardianship order is supported by sufficient credible evidence and should be affirmed.

II.

Parents have a "constitutional right 'to raise [their] child and maintain a relationship with that child, without undue interference by the state.'" N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 518 (App. Div. 2018) (quoting N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 18 (2013)).

---

[20] Judge Furnari "also acknowledged . . . the [children's] resource parents . . . continue to maintain the sibling bond between the children," and that, "[a]ccording to Dr. Alonso[,] the child[ren] see each other three to four times a month"; "have sleepovers"; spend certain holidays together; "and have a relationship with their [resource] parents and their sibling's resource parents."

[21] Defendants advised the court of their intent to appeal the decision and requested that they be permitted to continue visitation with the children pending defendants' appeals, to which the Division agreed.

"Permanent termination of parental rights is the ultimate intrusion on [this] right . . . ." A.L., 213 N.J. at 25. However, this right is "not absolute," K.H.O., 161 N.J. at 347, and must be balanced against "[t]he State['s] . . . basic responsibility, as parens patriae, to protect children from serious physical and psychological harm," N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 102 (2008).

In reviewing a decision to terminate parental rights, "[t]he scope of our review of [the] . . . court's factual findings is limited." N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 476 (App. Div. 2012). "A Family Part's decision to terminate parental rights will not be disturbed when there is substantial credible evidence in the record to support the court's findings," N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 368 (App. Div. 2015), because the court "has the opportunity to make first-hand credibility judgments about the witnesses . . . [and] a 'feel of the case' that can never be realized by a review of the cold record," E.P., 196 N.J. at 104 (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191

N.J. 596, 605 (2007)). We review the trial court's legal conclusions de novo. N.J. Div. of Child Prot. & Permanency v. J.B., 459 N.J. Super. 442, 451 (App. Div. 2019).

Applying this standard, based on our review of the record and for the reasons that follow, we reject Laura's argument that the court erred by admitting the caseworker's summary of recordings of statements made by defendants to the police, and defendants' contention the Division failed to prove each prong of the best-interests standard by clear and convincing evidence.

A.

Laura contends the trial court's findings on each prong were based on "incompetent testimony and evidence" because "the [Division's] investigat[or] . . . entered a personal narrative based upon his viewing of" defendants' recorded video statements to the Newark PD, and the Division's experts later relied upon the investigation summary in "formulating [their] opinions." She claims "[a]ll evidence and testimony which derived from or included [the Division investigator's] personal rendition of the interrogations [is] . . . rife with inadmissible, embedded hearsay," which "do[es] not satisfy [the Division]'s 'clear and convincing' burden."

The doctrine of invited error dictates that a party is precluded "from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error." N.J. Div. of Youth and Fam. Servs. v. M.C. III, 201 N.J. 328, 340 (2010) (quoting Brett v. Great Am. Recreation, 144 N.J. 479, 503 (1996)); see also State v. Kemp, 195 N.J. 136, 155-56 (2008) (finding the doctrine of invited error barred the defendant from contesting on appeal testimony he agreed to at trial); Spedick v. Murphy, 266 N.J. Super. 573, 593 (App. Div. 1993) ("A party who consents to, acquiesces in, or encourages an error cannot use that error as the basis for an objection on appeal.").

In M.C. III, the defendant "consented to the admission of the . . . documents" he challenged as inadmissible on appeal. 201 N.J. at 341. The Court found that "by consenting to the admission of the documents, [the] defendant deprived the Division of the opportunity to overcome any objection and deprived the trial court of the necessity to make a ruling based on the arguments presented by both sides." Ibid. The Court explained "if defense counsel had objected to the . . . documents, and the trial court agreed with those objections, the Division could have taken steps to satisfy any evidentiary requirements needed for the admission of the documents or presented a witness

or witnesses in place of the documents." Ibid. However, because the "defense counsel had sufficient time to review the exhibits and raise objections," the Court found the defendant was "barred by the doctrine of invited error from contesting for the first time on appeal the admission of the . . . documents." Id. at 342. The Court noted, "Particularly where defense counsel may have made a strategic decision to try the case based on the documents, instead of possibly facing a witness's direct testimony, it would be unfair to the Division to reverse on this issue." Ibid.

The record establishes both defendants' counsel consented to the admission of the eighty-two exhibits the Division intended to rely upon to support its case for termination of defendants' parental rights, including the investigative summary of defendants' recorded video statements and the subsequent expert reports referencing the summary. The court advised it was "admit[ting] all [the exhibits]" and was "not going to run . . . through and read every one . . . unless it[ was] called to [the court's] attention as being particularly relevant."

Defendants do not allege they did not have "sufficient time to review the exhibits [or] raise objections," ibid.; Laura claims only it "clearly" could not "have been trial strategy [for defendants] to consent to the admission of hearsay

of this kind." Initially, we reject Laura's contention the lack of an objection could not have been a reasonable exercise of trial strategy. The investigator's summary consists of a restatement of portions of recorded statements defendants made to the police. Defendants had access to the recordings, and if the investigator's summary was in any manner inaccurate, defendants could have called the investigator who prepared the summary to testify. And, on appeal, defendants do not argue or establish the investigator's summary was in any manner inaccurate.[22]

---

[22] Laura argues her trial counsel's failure to object to the admission of the summary and the expert reports referencing the summary constituted ineffective assistance of trial counsel, but her claim is unsupported by any showing there is a reasonable probability that but for counsel's failure to object to the admission of the summary, the result of the guardianship trial would have been different. See N.J. Div. of Youth & Fam. Servs. v. B.R., 192 N.J. 301, 307-09 (2007) (applying the Strickland v. Washington, 466 U.S. 668, 694 (1984), standard, requiring a showing that counsel's performance fell "outside the broad range of professionally acceptable performance," and "counsel's deficient performance . . . prejudice[d] the defense," to claims of ineffective assistance of counsel in guardianship cases). Laura may have demonstrated she was prejudiced by admission of the summary by showing it inaccurately described what she said during her statements to the police. Laura does not make any such showing, assert the investigator's summary of her statements was inaccurate, or otherwise demonstrate she was prejudiced by admission of the summary. Those failures require rejection of her ineffective assistance of counsel claim and otherwise support the inference that her trial counsel made a reasoned strategic decision not to object to the admission of the summary because it was accurate and rendered unnecessary any review by the court of the recordings of Laura's statements to the police.

Under those circumstances, we reasonably infer defense counsel made the strategic decision not to object to the investigator's alleged hearsay summary because it accurately detailed defendants' statements on the recordings. Additionally, by not objecting to the summary, defendants avoided the court's review of the recordings showing defendants provided conflicting and inconsistent versions of the purported events they claimed resulted in the children's serious injuries. In any event, we are convinced defendants' consent to the admission of the investigative summary bars Laura's challenge on appeal to the admission of the summary under the doctrine of invited error. See M.C. III, 201 N.J. at 342.

We also note that "[i]n spite of our invocation of the doctrine of invited error, we would not automatically apply the doctrine if it were to 'cause a fundamental miscarriage of justice.'" Ibid. (quoting Brett, 144 N.J. at 508). However, as was the case in M.C. III, and for the reasons we have explained, we are convinced Laura offers no evidence establishing any fundamental injustice which would warrant a relaxed application of the doctrine. See ibid. To the contrary, even if the investigative summary was admitted in error, we find its admission was not "plain error" and was not "clearly capable of producing an unjust result." R. 2:10-2.

The record does not support Laura's claim the court's guardianship decision was dependent on the investigator's summary of defendants' recorded statements to the police. In the first instance, the record otherwise establishes defendants gave conflicting versions of the purported events leading to the children's injuries directly to the Division, and to Dr. Weiner and Dr. Alonso. In addition, the court primarily relied on Dr. Weiner's and Dr. Alonso's expert testimony to support its determination defendants presented an ongoing risk of harm to the children and are unable or unwilling to remediate the risk of harm in part because they offered conflicting and inconsistent versions of the events resulting in Kira's and Cara's injuries. Dr. Weiner had a proper basis for her opinion concerning defendants' conflicting versions of the events independent of the investigator's summary because she reviewed the recorded statements to the police.

The court similarly accepted Dr. Alonso's testimony, and, although she did not review the recordings of defendants' statements to the police, she conducted four separate evaluations of defendants during which they offered conflicting and inconsistent versions of the events leading to the children's injuries. Moreover, it was permissible for Dr. Alonso to rely on hearsay in the investigator's summary if that hearsay is "of [the] type reasonably relied upon

by experts in the particular field in forming opinions or inferences upon the subject." N.J.R.E. 703. Laura does not contend Dr. Alonso's reliance on the investigator's summary, to the extent it may have supported her expert opinion testimony, violated N.J.R.E. 703.

In sum, we find no basis in the record to conclude the court's guardianship decision was dependent upon the investigator's summary of defendants' statements to the police. There was other evidence establishing defendants offered numerous, varied, and inconsistent versions of the events leading to the children's injuries, and the experts otherwise testified the events defendants offered could not have resulted in the serious injuries found. The court properly accepted Dr. Weiner's and Dr. Alonso's opinion testimony concerning the significance of defendants' inconsistent versions of the events in its analysis of the Division's proofs under N.J.S.A. 30:4C-15.1(a), and that testimony supported the court's findings and conclusions.

B.

We next consider defendants' argument the court erred by finding the Division clearly and convincingly satisfied its burden of proving each of the four elements required for termination of parental rights under N.J.S.A. 30:4C-15.1(a). Based on our review of the record, we are convinced Judge Furnari

conducted the required fact-sensitive analysis of each statutory factor, see K.H.O., 161 N.J. at 348, and we affirm substantially for the reasons set forth in his comprehensive and well-reasoned decision. We add only the following comments.

The court's finding the Division proved by clear and convincing evidence that defendants harmed the children, present a continuing risk of harm, and are unwilling or unable to alleviate the risk of harm is supported by substantial credible evidence. See N.J.S.A. 30:4C-15.1(a)(1) to (2). Kira was seriously injured while in defendants' care, and, despite defendants' participation in multiple services following Kira's injuries, Cara sustained similarly severe injuries in defendants' care. As Judge Furnari explained, "Dr. Weiner concluded . . . none of [defendants'] explanations . . . reasonably accounted for" Cara's injuries, "and the only explanation was physical abuse." Dr. Alonso determined defendants "continue[d] to present with denial, minimization, and new accounts"; "[c]hronic patterns of serious injury to the children, completion of services, and lack of explanations persist"; "the risk factors that led to [the children]'s injuries continue to be present and have not been identified"; and "[a]s long as [defendants] continue to present as guarded about the circumstances that led to their children being injured, it is difficult to make any

recommendations that would . . . reduce the risk of harm [to] the children . . . if placed in their care."

That evidence supports the court's findings that "neither [defendant] is in a position to care for [the children], nor will they be able to do so in the [foreseeable] future." Thus, the court concluded the children's "safety, health[,] or development has been or will continue to be endangered by the parental relationship," N.J.S.A. 30:4C-15.1(a)(1), and defendants are "unwilling or unable to eliminate the harm facing the child[ren]," N.J.S.A. 30:4C-15.1(a)(2). We discern no basis to disturb the court's findings on the first two prongs.[23]

---

[23] In support of its determination on the first two prongs, the court correctly noted Kira was "three years old" at the time of trial and "ha[d] been in Division custody for over two years," and Cara was "[twenty] months old" and "ha[d] . . . been in . . . Division custody for [eighteen] months." The court thus found "[b]oth children have been denied permanency as a result of [d]efendant[s'] inability to parent, in spite of [provided] services," and that, based on defendants' continued minimization of their involvement in the children's injuries and Dr. Alonso's resulting inability to recommend services to ameliorate the risk of harm, the children would continue to be denied permanency if defendants' parental rights were not terminated. Because a child's unfulfilled need for a permanent home constitutes harm under the first prong, see N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 591-92 (App. Div. 1996), the court's determination that defendants harmed the children by denying them permanency and defendants are "unwilling or unable to eliminate the harm," N.J.S.A. 30:4C-15.1(a)(2), because the children will continue to be denied permanency if defendants' parental rights are not terminated, is supported by substantial credible evidence, see B.G.S., 291 N.J. Super. at 591-92.

The court's finding under the third prong that the Division provided defendants with numerous and ongoing "services to help [defendants] correct the circumstances which led to the child[ren's] placement outside the home" is also supported by substantial credible evidence. N.J.S.A. 30:4C-15.1(a)(3). Moreover, we reject Laura's claim the Division did not honor its obligation to "thoroughly explore[] and exhaust[]" "alternatives to terminating parental rights," N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 434 (App. Div. 2001), because the Division was still assessing Christine and Yara for placement at the time of trial.[24]

The evidence shows the Division began assessing Christine when she was first presented in July 2019, but Christine delayed the process by proposing "to allow" her boyfriend to live in her home. "[S]he decided . . . not . . . to allow [it]" in December 2019, and the Division again began "assess[ing her] by

[24] Laura's claim the court erred by finding KLG was inappropriate because it based its determination on "third[-]party testimony" that the children's resource parents were committed to adoption lacks merit. First, defendants did not object at trial to the testimony, which otherwise established the children's resource parents were firmly committed to adoption. The court was therefore able to properly rely on the testimony. See M.C. III., 201 N.J. at 341-42. Moreover, the record on appeal contains letters from both children's resource parents indicating their intention to adopt the children. The court correctly concluded KLG was not a reasonable alternative to adoption. See N.J.S.A. 3B:12A-1(c) (providing KLG is only appropriate "where adoption is neither feasible nor likely").

herself." Yara received a rule-out letter in December 2019 because she was only "willing to be assessed . . . in the event that . . . [Christine did] not become licensed." The Division considered several of defendants' other relatives as alternative caregivers, each of whom was ruled out and did not appeal those determinations.

"Because . . . children have an essential and overriding interest in stability and permanency, it is inimical to their welfare that their legal status remain unresolved." In re Guardianship of J.C., 129 N.J. 1, 26 (1992). Thus, "Family Part judges conducting termination of parental rights proceedings must be mindful of the need for prompt determination of the difficult issues before them." N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 146-47 (2018). Accordingly, N.J.S.A. 30:4C-15.2 mandates that "[a] final hearing for guardianship shall be held within three months from the date the petition is filed," which in this case was in August 2019. The court issued its decision terminating defendants' parental rights on February 25, 2020. In light of these principles, we find no error in the court rendering its decision prior to the Division completing its assessment of Christine. See ibid.; R.L.M., 236 N.J. at 146-47; J.C., 129 N.J. at 26.

Finally, the court's determination that termination of defendants' parental rights will not do more harm than good is similarly supported by substantial credible evidence. The main inquiry on the fourth prong "is whether, after considering and balancing the two relationships, the child[ren] will suffer a greater harm from the termination of ties with [defendants] than from the permanent disruption of [the children's] relationship with [their resource] parents." K.H.O., 161 N.J. at 355; see also N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 453-54 (2012) (holding termination of the defendant's parental rights would not do more harm than good where the child's attachment to the resource parent was stronger than the child's attachment to the legal parent); N.J. Div. of Child Prot. & Permanency v. N.C.M., 438 N.J. Super. 356, 372-73 (App. Div. 2014) (concluding the Division satisfied the fourth prong with expert testimony that the children had developed a "secure[] attach[ment]" to their resource parent but had only an "insecure attachment" to their legal parent).

The uncontroverted evidence established Kira is "not securely attached to" defendants but "is securely attached to her [resource parent]"; Kira "would suffer . . . significant and enduring harm" if her relationship with her resource parent is severed; and Cara "would likely" suffer harm if the relationship with

her resource parents is severed, which defendants are unable to mitigate, but her resource parents "would likely serve to mitigate any [harm] she may experience through the loss of" her relationship with defendants. The court's determination the Division satisfied the fourth prong is amply supported by the record.[25] See K.H.O., 161 N.J. at 355; F.M., 211 N.J. at 453-54; N.C.M., 438 N.J. Super. at 372-73.

To the extent we have not addressed any of defendants' remaining arguments, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[25] We also note that under the fourth prong, "the child[ren's] need for permanency and stability emerges as a central factor." K.H.O., 161 N.J. at 357. While this prong is typically required to be satisfied by expert testimony based on a comparison of bonding evaluations, see N.C.M., 438 N.J. Super. at 371, bonding evaluations are not required where termination is "not predicated upon bonding, but rather reflect[s the children]'s need for permanency and [the parents'] inability to care for [the children] in the foreseeable future," B.G.S., 291 N.J. Super. at 593. Here, the court found defendants have been unable to parent the children for the majority of the children's lives; the children have suffered from a lack of permanency as a result; and defendants are unable to care for the children in the foreseeable future. These findings are supported by substantial credible evidence, and they further, and independently, support the court's determination on the fourth prong. See ibid.